**Brian COPELAND, Plaintiff,**

v.

**Cheryl ROSEN and the New York City Board of Education, Defendants.**

**No. 96 CIV. 6308(PKL).**

United States District Court, S.D. New York.

March 9, 1999.

Joan Franklin Mosley, New York City, for Plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York, New York City, Susan Emma Olick, of counsel, for Defendant.

### OPINION AND ORDER

LEISURE, District Judge.

This case concerns allegations that a principal at Lincoln Academy, a local middle school, has systematically forced out the school's black male teachers. Plaintiff, one of those teachers, brings this action against the principal and the City of New York Board of Education (the "Board"), alleging the principal discriminated against him on the basis of his race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants move for summary judgment in their favor. For the reasons stated in this Opinion, defendants' motion is GRANTED in part and DENIED in part.

### I. Standard for Summary Judgment

A moving party is entitled to summary judgment if the Court determines no genuine issue of material fact exists to be tried and the party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56; *see also Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (citation omitted); *see also Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1231 (2d Cir.1996).

The Court's function in adjudicating summary judgment motions is not to try issues of fact, but instead to determine whether there are such issues. *See Sutera v. Schering Corp.,* 73 F.3d 13, 15–16 (2d Cir.1995). In determining whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Holt,* 95 F.3d at 129.

Because this case involves allegations of discrimination, an additional consideration applies. The Court "must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." *Gallo v. Prudential Residential Serv. Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994) (citations omitted); *see also Maresco v. Evans Chemetics,* 964 F.2d 106, 113 (2d Cir.1992).

Applying these principles, the facts of the instant case are as set forth below.

### II. Facts of the Case

Lincoln Academy ("Lincoln") is a middle school located on the upper west side of Manhattan. The school is one of a few small, semi-autonomous "alternative" public schools in the city formed to provide a specialized curriculum focused on a particular subject. The subject of focus at Lincoln is science. Like other "alternative" public schools in the city, Lincoln's attendees are selected through a formal application process.

During the relevant school term, 1992–93, the racial composition of Lincoln's student body was approximately 60% black and 40% hispanic. The racial makeup of the school's faculty was quite different. Of the fifteen teachers, twelve were white and the remainder—consisting of plaintiff, a male, Pamela Profit, a female, and Roy Yarbrough, a male—were black.

In the summer of 1992, defendant Cheryl Rosen became the Director of Lincoln, a position functionally equivalent to the position of principal at more traditional

schools. It is alleged that Rosen on several occasions exhibited hostility toward the school's black students by, among other things, describing students as "monkeys". *See* Affidavit of Roy Yarbrough, dated June 15, 1998 [hereinafter "Yarbrough Aff."], ¶ 6. Plaintiff further alleges through the proffer of evidence that Rosen has a particular disdain for black male students, and has turned away black male student applicants even when they are more qualified than accepted applicants. *See id.*

In 1993, Rosen dismissed both of the black male teachers at Lincoln. The first to go was Yarbrough, a seasoned teacher and university lecturer who Rosen had hired. *See id.* ¶ 1; Affidavit of Cheryl Rosen, dated July 15, 1998 [hereinafter "Rosen Reply Aff."], ¶ 3. By notice dated January 11, 1993, Rosen terminated Yarbrough without explanation. *See* Yarbrough Aff. ¶¶ 5, 8, 15; *see also* Declaration of Joan Franklin Mosley, Esq., dated June 21, 1998 [hereinafter "Mosley Decl."], Ex. 8. Yarbrough had not received any criticisms of his teaching, he had been rated satisfactory in his most recent in-class evaluation and was allegedly liked by students. *See* Yarbrough Aff. ¶¶ 5, 8, 12, 15; Mosley Decl., Ex. 5. Many students and parents were upset by the termination and protested unsuccessfully for his reinstatement. *See* Mosley Decl., Ex. 5. Yarbrough believes he was terminated by Rosen because he is a black male. *See id.* ¶ 18. Rosen replaced Yarbrough with Kaye Kerr, a black female. *See* Affidavit of Brian Copeland, dated June 15, 1998 [hereinafter "Copeland Aff."], ¶ 3.

The axe fell next on plaintiff. By letter dated July 20, 1993, Rosen informed plaintiff that he had been terminated effective as of the previous month. *See* Mosley Decl., Ex. 7. During the school term prior to his termination, it is alleged that Rosen held plaintiff to a different standard of performance than white teachers and made false accusations against him. For example, Rosen chastised plaintiff on the few occasions he turned in his attendance sheets in the afternoon; many white faculty members routinely followed that same course and were not reprimanded. *See* Copeland Aff. ¶¶ 6, 21; Affidavit of Eric Mahoney, dated June 15, 1998 [hereinafter "Mahoney Aff."], ¶ 4. Rosen further accused plaintiff of having an untidy classroom, even though his room was neat and clean. *See* Copeland Aff. ¶ 6; Mahoney Aff. ¶ 5; Yarbrough Aff. ¶ 9. White teachers with cluttered and dirty classrooms were not criticized. *See* Copeland Aff. ¶ 6. In addition, plaintiff was wrongly accused of not displaying student work and other items of interest. *See id.* ¶ 19. In contrast, white teachers, such as Eric Mahoney, did not always display student work and yet were not reprimanded in regard thereto. *See* Mahoney Aff. ¶ 5. Plaintiff was also observed more frequently than other teachers and Rosen requested to review his lesson plans at a similarly disparate rate. *See* Copeland Aff. ¶¶ 6, 13, 17, 19, 22, 28–29.

Three final suspect incidents preceded plaintiff's termination. In February 1993, Rosen threatened to fire plaintiff for participating in an off-campus meeting with students and parents concerned about the termination of Yarbrough, even though apparently no prohibition against such meetings exist. *See* Copeland Aff. ¶ 25; Rosen Aff., Ex. I. The next month, Rosen accused plaintiff of keeping a toy gun and razor blade in a desk drawer in one of the school rooms. *See* Copeland Aff. ¶ 27. Rosen made the accusation without first asking plaintiff whether the items were his and without inquiring of a white female teacher who used the classroom as to whether the objects were hers. *See id.* ¶¶ 6, 12, 27. Plaintiff denies having placed either item in the drawer. *See id.*

Finally, at the end of the 1992–93 school term, Rosen gave plaintiff an "unsatisfactory" rating. This rating was given despite the fact that plaintiff's students had the highest standardized test scores in the school for math and despite plaintiff's alleged outstanding rapport with students

and successful supervision of various extra-curricular student activities, such as the school yearbook and the boys' and girls' basketball teams. *See* Copeland Aff. ¶¶ 2, 4, 9; Mosley Decl., Ex. 9.

Following negotiations occurring through plaintiff's union representative, plaintiff's performance rating was changed to "satisfactory" and, in lieu of termination, plaintiff was permitted to request a transfer to another school. *See* Copeland Aff. ¶¶ 31–32.

In succeeding years, Rosen has terminated only one other teacher, Gerald Sterlin, also a black male. Rosen, who hired Sterlin, has asserted that he was discharged because of his unsatisfactory performance. *See id.* ¶ 8; Rosen Aff. ¶ 39; Rosen Reply Aff. ¶¶ 3–5.

On August 20, 1996, following his unsuccessful pursuit of remedies before the United States Equal Employment Opportunity Commission and the New York State Division of Human Rights, plaintiff filed the instant case *pro se,* alleging race and sex discrimination in violation of Title VII. By Order dated May 16, 1997, Magistrate Judge Katz, the magistrate assigned to this case for general pre-trial case management, directed that *pro bono* counsel be sought to represent plaintiff. Joan Franklin & Associates, by Joan Franklin Mosley, Esq., subsequently made an appearance and continues to represent plaintiff in this action.

## III. Discussion

Defendants contend plaintiff has failed to establish a genuine issue of material fact that plaintiff was discriminated against on the basis of his race and/or sex in violation of Title VII. Before addressing that contention, the Court pauses to decide a lingering issue as to the capacities in which defendant Rosen may be sued under that statute.

### A. *Claims Against Rosen in Her Personal Capacity*

■ Plaintiff asserts his Title VII claim applies to Rosen in both her individual and official capacities. Plaintiff is wrong; the United States Court of Appeals for the Second Circuit has held that Title VII "limit[s] liability to employer-entities". *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995); *see also Pell v. Trustees of Columbia Univ. in the City of New York,* No. 97 Civ. 0193, 1998 WL 19989, at *9 (S.D.N.Y. Jan.21, 1998). Thus, individual employees may not be held personally liable under Title VII, even if they are supervisory personnel with the power to hire and fire other employees. *See Tomka,* 66 F.3d at 1314–15. Accordingly, a Title VII claim against an individual employee is treated as one for vicarious liability against the employer. *See id.* at 1313–17. Judgment in favor of defendant Rosen is, therefore, warranted insofar as plaintiff seeks to hold her personally liable under Title VII.

■ Anticipating this outcome, plaintiff asserts in the alternative that his complaint, filed *pro se,* should be construed to allege a claim against Rosen in her personal capacity pursuant to Section 296 of the New York State Human Rights Law. Among other things, § 296 imposes personal liability on employees who are actual participants in acts of discrimination. *See Tomka,* 66 F.3d at 1317.

The Court must, of course, construe complaints filed *pro se* liberally and with great leniency toward the *pro se* party, since he or she likely is untrained in the law and unfamiliar with how properly to plead factual allegations and to state all the various causes of action which may arise from a given incident. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). The light in which the Court views the complaint is somewhat less forgiving, however, where plaintiff has obtained counsel after filing the original pleading. The professional duties of counsel include

the obligation carefully to review the original *pro se* complaint and promptly to cure any deficiencies, elaborate on allegations where appropriate and specify any additional causes of action worthy of pursuit. The appropriate way in which to effect such revisions is by way of formal amendment. *Cf. DeCarlo v. Fry,* 141 F.3d 56, 62 (2d Cir.1998) ("plaintiffs should have had at least one further opportunity to state these claims as best they could [by way of amendment], especially after the appointment of *pro bono* counsel."). The *pro se* complaint does not give counsel *carte blanche* to attempt informally to imply new causes of action or additional allegations regarding existing claims, nor does it provide a meritorious excuse for excessive delays in making formal revisions.

Applying these considerations to the circumstances existing in the case at bar, the Court finds that the appropriate way to proceed is to grant plaintiff leave to amend the complaint in the interest of justice to add a § 296 claim and any related factual allegations. *See* Fed.R.Civ.P. 15(a). Insofar as plaintiff wishes to revise the complaint in any other respect, plaintiff shall seek leave of Court absent consent by defendants to the revisions.

That issue resolved, the Court turns to an assessment of the factual issues to which defendants' summary judgment motion is principally addressed.

### B. *Sufficiency of Evidence Supporting Plaintiff's Title VII Claim*

Title VII provides in relevant part that it shall be "unlawful ... for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff's allegations may be fairly characterized as involving three somewhat interrelated forms of discriminatory conduct: (i) creation of a work environment hostile to plaintiff because of his race and sex; (ii) retaliation against plaintiff for participating in an off-campus meeting concerning Yarbrough's termination; and (iii) termination of plaintiff because of his race and sex. The Court addresses whether there are genuine issues of material fact as to each of these claims.

### 1. *Hostile Work Environment Claim*

To prevail on a hostile work environment claim, plaintiff must show both (i) that a specific basis exists for imputing the conduct at issue to the employer, and (ii) that the conduct at issue in fact has created a hostile work environment violative of Title VII. *See Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998). For the reasons that follow, the Court finds that plaintiff has raised a genuine issue of material fact as to each of these elements.

### a. *The Board's Vicarious Liability*

Hostile work environment claims by their nature tend to involve informal alteration of the terms and conditions of an employee's work situation. *See, e.g., Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2264–65, 141 L.Ed.2d 633 (1998). Thus, in contrast with formal employment decisions, such as hiring, firing, promotion, alteration of responsibilities and the like, the changes in the work environment at issue when an employee claims the environment has become "hostile" or "abusive" are not always obviously imputable to the employer. They may simply be peculiar, isolated incidents or may be perpetrated by persons lacking any of the authority of the employer, such that Title VII would not provide a means for holding the employer liable for the incident. *See id.* at 2265–2270.

Accordingly, a requirement in sustaining any hostile work environment claim is that the alleged conduct of the harassing employee be shown to be attributable to the employer. Determination of whether that obstacle has been overcome generally hinges as a preliminary matter on whether

the discriminatory acts were perpetrated by supervisory or non-supervisory employees. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766–67 (2d Cir.1998). Where a supervisor—someone who acts with the authority and command of the employer vis-a-vis other employees—has been directly involved in the alleged wrongdoing, the supervisor's actions are considered those of the employer and, consequently, the employer is deemed presumptively liable. *See id.* at 767. In contrast, where no supervisory personnel are involved, and the acts are instead perpetrated by a mere "co-employee" or "co-employees", vicarious liability is not presumed. *See id.* at 766–67. Rather, in an approach similar to that employed in the § 1983 context concerning vicarious liability, a plaintiff subjected to "co-employee" harassment shoulders the burden to establish some tangible connection between the incident and the conduct of the employer. Such a connection may be proven, for example, by pointing to a deliberate or reckless failure of supervisory personnel to intervene to stop the harassment or by proof of relevant defects in preventative and/or remedial procedures established by the employer. *See, e.g., Tomka,* 66 F.3d at 1305 ("the employer will generally not be liable unless 'the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.'") (quoting *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992)).

The case at bar presents no difficulty in the resolution of this issue. Defendants concede Rosen, the principal of the school, was a direct supervisor of plaintiff. Defendants have not, moreover, raised the affirmative defense recently articulated by the Supreme Court by which an employer may avoid liability for a hostile work environment if it can establish no genuine issue of material fact that: "(1) [it] exercised reasonable care to prevent and promptly correct any ... harassment by such a supervisor, and (2) the employee unreasonably failed to avail h[im]self of any correc-

tive or preventative opportunities provided by the employer or to avoid harm otherwise." *Quinn,* 159 F.3d at 767. Therefore, as of this stage of the proceedings, the Board is deemed presumptively liable for the hostile work environment allegedly facilitated by Rosen.

b. *Sufficiency of the Evidence of a Hostile Work Environment*

Once the employer is established to be vicariously liable, the remaining issue is whether the plaintiff has made out a case that he or she was actually subjected to a hostile work environment. Evidence in this respect is sufficient to withstand a motion for summary judgment if a reasonable juror could infer from it the existence of "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks and citations omitted). In making this assessment, the Court is to look to the "totality of the circumstances" presented, *Quinn,* 159 F.3d at 767, including the plaintiff's subjective belief as to whether the environment was abusive. *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Generally, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Tomka,* 66 F.3d at 1305 n. 5; *see also Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577–78 (2d Cir.1989) (alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."). Certain conduct may, however, be sufficiently severe such that even a single occurrence of the conduct suffices to create a hostile work environment. *See*

*Quinn,* 159 F.3d at 768; *Tomka,* 66 F.3d at 1305.

The Court finds a genuine issue of material fact exists as to whether Rosen created an environment abusive to plaintiff because he is a black man. Construing the evidence in the light most favorable to plaintiff, Rosen engaged in an on-going campaign during 1992 and 1993 of harassing plaintiff by repeatedly subjecting him to false criticism and holding him to a different performance standard than non-black male teachers. Rosen's termination only of black male teachers, her seemingly racist description of students and her bias against black male student applicants further reasonably can be construed to indicate Rosen was motivated by discriminatory animus in her treatment of plaintiff. Finally, while not sufficient in itself, it is probative that plaintiff felt subjected to an abusive work environment and further believes that Rosen's hostility stems from the fact that he is a black man.

█ With respect to Rosen's termination of other black male teachers, defendants contend no discriminatory animus may be inferred because Rosen was also the person who hired those teachers. Defendants' contention is premised on the so-called "same actor" inference, the main thrust of which is that it is difficult to infer that the person who hires an employee in a protected class would "suddenly develop an aversion to members of that class." *Ruane v. Continental Cas. Co.,* No. 96 Civ. 7153, 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998).

The Court rejects defendants' contention that the "same actor" inference *mandates,* at the summary judgment stage or any other, that no inference of discriminatory intent may be drawn in these circumstances. The "same actor" inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand. *See, e.g., Grady v.*

*Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997); *Ruane,* 1998 WL 292103, at *8. There are a variety of plausible explanations of such "hire-fire" conduct that may support an inference of discriminatory animus. For example, it is plausible that a supervisor who has not previously worked with members of a certain protected class would come to realize his or her animus toward individuals in that group only upon actually hiring and working with such persons. It is further plausible that even a supervisor who previously has worked congenially with members of a protected class would develop a prejudice towards them after, for example, having an experience outside the workplace with other members of that class.

There may also exist supervisors who purposefully hire members of a protected class and then fire them in the hope that the act of hiring will be the focus of attention and will allay any suspicions about other discriminatory acts of the supervisor. A pattern of hiring followed by firings may in certain cases raise a strong inference of such a ploy, especially where the hirings and firings occur in rapid succession, suggesting that the supervisor is seeking to reap the perceived benefit of the hirings while avoiding working for a sustained period with persons against whom the supervisor is prejudiced. Moreover, situations may arise where a penitent supervisor is involved, one who attempts to assuage his or her guilt in harboring prejudice against other employees by hiring members of the protected class, only later to find himself or herself overcome again by animus which leads the supervisor to terminate relevant employees. In short, the Court does not underestimate the variety of unlawful motivations which may lurk behind the conduct of a person who hires and then fires an individual in a protected class. Such motivations, like all issues of intent, are by their very nature difficult to bring to light, especially prior to scrutiny of the relevant individual on the stand at trial.

It may be the case that reliance on the "same actor" inference at the summary judgment stage would be appropriate, even given the Court's obligation to construe the facts in the light most favorable to the plaintiff, if the plaintiff has failed to adduce any evidence to support his or her allegations of discriminatory animus other than a mere firing of a member of a protected class by the hirer. In the instant case, however, plaintiff has proffered ample other evidence supporting his allegations of race and sex discrimination.[1] Considered against the background of that other evidence, Rosen's pattern of terminating only black male employees during her tenure as principal reasonably can be inferred to suggest Rosen terminated plaintiff because he is a black man, even considering that Rosen hired some of those terminated employees.

Accordingly, for all the reasons stated, summary judgment in favor of defendants on plaintiff's hostile work environment claim under Title VII would be inappropriate.

### 2. Retaliation Claim

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any ... employee[] ... because [such employee] has opposed any practice made an unlawful practice by this title ...." 42 U.S.C. § 2000e-3(a).

Plaintiff asserts that Rosen retaliated against him for attending a meeting concerning the alleged discriminatory termination of Yarbrough. Unlike plaintiff's hostile work environment claim, which on a motion for summary judgment simply involves an assessment of the totality of the circumstances presented, plaintiff's retaliation claim is subject to the more cumbersome three-part, burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Pursuant to that analysis, plaintiff must proffer facts sufficient to establish a *prima facie* case that the circumstances give rise to an inference of retaliation. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If plaintiff satisfies that threshold burden, then the burden of production shifts to defendant to proffer a legitimate, non-retaliatory reason for the alleged wrongdoing. *Id.* at 802, 93 S.Ct. 1817. The burden of persuasion then rests with plaintiff to persuade the factfinder that the employer's explanation is a pretext for retaliation. *Id.* at 803–04, 93 S.Ct. 1817.

### a. Plaintiff's Prima Facie Case

■ To establish a *prima facie* case of retaliation, an employee must show " '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.' " *Quinn*, 159 F.3d at 769 (brackets in original) (quoting *Tomka*, 66 F.3d at 1308). "The burden of establishing a *prima facie* case [of retaliation] is not onerous, and has been frequently described as minimal." *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir.1997) (per curiam) (citations omitted); *see also Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998) ("To make out a *prima facie* case is not a demanding burden.").

In the instant case, plaintiff has met the *de minimis* production requirement as to each element of his retaliation claim.

#### (i) Protected Opposition

First, plaintiff's participation in the off-campus meeting with students and their parents may reasonably be construed to constitute "opposition" to perceived discrimination. In ratifying Title VII's anti-retaliation provision, "Congress sought to protect a wide range of activity". *Grant v.*

---

1. Thus, even if the Court were to disregard entirely defendant Rosen's history of firing only black male teachers, the Court would still find plaintiff's evidence supporting his claims sufficient to withstand defendants' motion for summary judgment.

*Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989). Such protected activity may include formal opposition in the form of filing of charges with a local, state or Federal agency, or initiation of internal company grievance procedures. Less formal types of opposition are also protected, "including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). Moreover, a plaintiff need not establish the conduct he opposes actually constitutes a violation of Title VII; rather, he need only have possessed a "'good faith reasonable belief that the underlying employment practice was unlawful' under th[e] statute." *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996)).

Construing the facts in the light most favorable to plaintiff, the off-campus gathering in which plaintiff participated constituted a protest meeting prompted by the attendees' good faith, reasonable belief that Yarbrough had been discriminatorily discharged. Plaintiff's discussions with parents at the gathering is, moreover, similar in nature to the critical letter written by an employee to customers, conduct which the Second Circuit has found constitutes protected activity. *See Sumner*, 899 F.2d at 209. Accordingly, the Court finds plaintiff has established a *prima facie* case that he was engaged in a protected activity.

#### (ii) *Adverse Employment Action*

Second, plaintiff's receipt of an "unsatisfactory" rating and, later, a related letter of termination following the occurrence of the meeting suffices to establish an adverse employment action. Defendants suggest no adverse employment action may be considered to have occurred because plaintiff was ultimately able to nego-tiate a transfer to another school in lieu of a formal discharge from Lincoln. The Court disagrees. The inquiry in this respect is not whether defendants' action ultimately had an "adverse" effect on plaintiff in terms of his standard of living, happiness or ability to secure an equivalent position elsewhere. Rather, the relevant issue is whether the employer's action constituted a "'materially adverse change in the *terms and conditions* of [plaintiff's current] employment"'" with that employer. *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.1997) (emphasis added) (quoting *McKenney v. New York City Off–Track Betting Corp.*, 903 F.Supp. 619, 623 (S.D.N.Y.1995)).

It is undisputed that plaintiff was required to leave his employment with Lincoln. Such an employment decision is clearly an adverse change in the terms and conditions of plaintiff's employ with Lincoln. Consequently, plaintiff has adduced sufficient evidence at the summary judgment stage as to this element of his retaliation claim. At most, defendants' assertion would be relevant to assessment of damages, since it suggests plaintiff succeeded in avoiding some of the potential damage to him from the adverse employment decision by allegedly securing a similar position at another school.

#### (iii) *Causation*

Finally, plaintiff has proffered sufficient evidence that there is a causal connection between his protected activity and the adverse employment action. To satisfy this burden, plaintiff need only show that "a retaliatory motive play[ed] a part in the adverse employment actions", *i.e.*, that retaliation was a motivating factor. *Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 122 (2d Cir.1996) (bracket in original) (quoting *Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1254 (2d Cir.1987)). Correspondence from Rosen and another school supervisor suggests retaliation was a motivating factor in the rendering of an "unsatisfactory" rating and in the termination of defendant's employ. A letter

from Rosen to plaintiff dated March 23, 1993, states that Rosen considered plaintiff's discussion of Yarbrough's termination with parents and students to be unprofessional and that it could lead Rosen to give plaintiff an "unsatisfactory" rating and to discharge him. *See* Rosen Aff., Ex. I. A subsequent letter from the Director of Alternative Schools, John Elwell, confirms this view that plaintiff's discussion of personnel issues with parents was inappropriate and could lead to termination. *See* Deposition of Cheryl Rosen, dated January 22, 1997, Ex. 9. Significantly, however, defendants are unable to cite any policy, practice or regulation of the New York City school system suggesting that an adverse employment decision is permissible based on activities such as plaintiff's. These considerations, in combination with, or even apart from, the timing of plaintiff's receipt of an unsatisfactory rating within four months of the meeting, establish a *prima facie* case that the adverse rating and the subsequent termination occurred as a result of plaintiff's protected activity.

### b. *Defendants' Legitimate, Non-Retaliatory Explanation*

█ Because plaintiff has established a *prima facie* case of retaliation, defendant must come forward with a legitimate, non-retaliatory explanation for the adverse employment decisions. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Like plaintiff's initial burden, defendant's burden at this stage is light. *Greenway,* 143 F.3d at 52. Defendant "must simply articulate an explanation that, if true, would connote lawful behavior." *Id.* (citation omitted).

The Court finds defendants have satisfied their *de minimis* burden by proffering evidence supporting the legitimate, non-retaliatory explanation that the adverse rating and subsequent discharge of plaintiff occurred as a result of plaintiff's poor teaching performance and general uncooperativeness.

### c. *Pretext*

█ Once the first two steps of the *McDonnell Douglas* analysis have been fulfilled, the presumption of retaliation established by plaintiff's *prima facie* case drops away and plaintiff shoulders the ultimate burden of persuasion to show there is a genuine issue of material fact as to whether defendant's explanation is a mere pretext for retaliation. The Court finds plaintiff has met that burden. Defendants' proffered explanation and supporting evidence is consistent with plaintiff's *prima facie* evidence suggesting the explanation is merely a fabrication designed to insulate defendants from liability for Rosen's alleged retaliatory actions. Thus, "the conflict between the plaintiff's evidence [of retaliation] ... and the employer's evidence of a non[retaliatory] reason reflects a question of fact to be resolved by the factfinder after trial." *Cronin,* 46 F.3d at 203. Accordingly, summary judgment in favor of defendants regarding plaintiff's retaliation claims would be inappropriate.

### 3. *Discriminatory Termination Claim*

Plaintiff's last claim is that he was terminated because he is a black male. This claim, like plaintiff's retaliation claim, is analyzed according to the three-step *McDonnell Douglas* test. The Court addresses each of those steps.

### a. *Plaintiff's Prima Facie Case*

█ The elements of a *prima facie* case regarding a claim of discriminatory termination are: (i) membership in a protected class; (ii) qualification for the position at issue; (iii) an adverse employment decision; and (iv) occurrence of the decision under circumstances that lead to an inference of discrimination. *See Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997). Plaintiff easily satisfies the first three of these elements. Plaintiff is a black male; plaintiff had received satisfactory ratings in the New York City school system for several years preceding the relevant incidents, *see Thornley v. Penton*

*Publishing, Inc.*, 104 F.3d 26, 29–30 (2d Cir.1997); and, as already analyzed with respect to plaintiff's retaliation claim, plaintiff was forced out of Lincoln.

The only element of a *prima facie* case remaining to be satisfied is, therefore, whether plaintiff's discharge occurred under circumstances giving rise to an inference of discrimination. The Court finds that that element has easily been satisfied. Plaintiff has proffered evidence that Rosen expressed animus towards blacks generally by describing students as "monkeys"; that Rosen has given preference to non-black male applicants over more qualified black male applicants; that Rosen's history of discharging teachers evidences a discriminatory pattern of discharging black males; that Rosen made numerous false accusations against plaintiff in order to lay the groundwork for terminating him; and that Rosen held plaintiff to a different standard of performance than teachers who are not black males.

b. *Defendants' Legitimate, Non-Dis-criminatory Explanation*

 Likewise, defendants have satisfied their *prima facie* burden to proffer legitimate non-discriminatory reasons for the treatment of plaintiff. Defendants have submitted documentation suggesting plaintiff had had poor work performance and was unreceptive to Rosen's constructive criticism. Defendants have also proffered sworn testimony by Rosen that she has discharged teachers based only on their performance, not based on their sex and/or race. Finally, defendants have submitted both documentation and testimony disputing plaintiff's assertion that he was falsely accused of wrongdoing and that he was subjected to disparate treatment.

c. *Pretext*

 The parties' threshold burdens having been fulfilled, the remaining question is whether, given the evidence proffered by defendants and absent the presumption of discrimination attaching to plaintiff's *prima facie* case, plaintiff has established a genuine issue of material fact as to his claim of discriminatory termination. The Court finds that he has. Determination of whether defendant Rosen had a discriminatory motive largely hinges on whether her concerns about plaintiff's teaching abilities are legitimate or, instead, are simply falsehoods manufactured by Rosen because of her alleged bias against black men. That fact question involves credibility assessments that can only be made by the ultimate factfinder.

Moreover, defendants have failed to rebut several of the portions of the evidence proffered by plaintiff suggesting bias on the part of Rosen, including Rosen's purported use of racial slurs, her discrimination against black male student applicants and her disparate treatment of plaintiff in certain respects.

Accordingly, summary judgment in favor of defendants on this claim would be inappropriate.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is hereby GRANTED in part and DENIED in part. Plaintiff shall file an amended complaint containing a § 296 claim by March 29, 1999. Should plaintiff wish to amend the complaint in any other respect, plaintiff shall, absent consent, seek leave to amend by March 29, 1999; opposition, if any, shall be due April 12, 1999; and a reply, if any, shall be due April 19, 1999. The parties shall appear for a pre-trial conference before this Court at the United States Courthouse, 500 Pearl Street, New York, New York, on April 16, 1999, at 10:00 a.m.

**SO ORDERED.**