**Maria O. RAMOS, Plaintiff,**

v.

**MARRIOTT INTERNATIONAL, INC., Defendant.**

**No. 99 CIV 9408 WCC.**

United States District Court, S.D. New York.

March 14, 2001.

Minotti & Iaia, LLP, White Plains, NY (Raymond J. Iaia, of Counsel), for plaintiff.

White, Fleischner & Fino, New York City (Nancy Davis Lyness, of Counsel), for defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Maria O. Ramos, brings the instant action against defendant Marriott International, Inc. ("Marriott") pursuant to Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and New York State Human Rights Law, New York Exec. Law § 290 *et seq.* ("NYHRL"). Plaintiff alleges that because of her gender, and in retaliation for her complaints made to her supervisors and defendant's Human Resources Department, she was terminated. She further alleges that she was subjected to a hostile work environment by her supervisor and coworkers during her tenure of employment. Defendant now moves for summary judgment pursuant to FED. R. CIV. P. 56(b). For the reasons stated hereinafter, defendant's motion is granted in part and denied in part.

### BACKGROUND

In June 1998, plaintiff was hired by defendant as its first female Banquet Room Sous Chef at its Renaissance Westchester Hotel (the "Hotel") located in White Plains, N.Y.[1] (Lyness Aff. ¶ 4; Pl. Stmt. Undisp. Mat. Facts ¶ 10, Exs. A, B.) As the Banquet Room Sous Chef, she was the lead cook in the Banquet Room of the Hotel. The Banquet Room services all scheduled events for the Hotel. (Lyness Aff. ¶ 74.) Plaintiff's responsibilities included, *inter alia,* ordering and preparing the food for the scheduled events as well as managing and scheduling a staff of approximately seven kitchen workers. (*Id.* ¶¶ 0, 74–75; Lanchais Dep. at 8–20.)

Although plaintiff's cooking skills were never the subject of criticism by her supervisors or the guests of the Hotel, she began having problems with her staff within weeks of her employment. (Pl. Dep. at 283–84.) The staff refused to take any sort of instruction from plaintiff (*id.*) and both plaintiff and her staff were offended by each others' comments and "attitudes." (Lyness Aff. ¶ 25, Ex. O.)

---

1. During plaintiff's employment, the kitchen hierarchy was:

Executive Chef

Woodlands Restaurant and Banquet Room Chefs

Woodlands Restaurant and Banquet Room Sous Chefs

Woodlands Restaurant and Banquet Room Assistant Sous Chefs

Woodlands Restaurant and Banquet Room Chef de Parties

Woodlands Restaurant and Banquet Room Commis Cooks

After plaintiff's employment was terminated, the position of Executive Sous Chef was created. In the hierarchy it falls one step below the Executive Chef and one step above the Woodlands Restaurant and Banquet Room Chefs. (Lanchais Dep. at 8–20.)

The "final straw" that ultimately led to plaintiff's termination occurred on June 7, 1999. (Lyness Aff. ¶ 76.) Plaintiff interrupted a meeting of her supervisor, Jean Claude Lanchais, Executive Chef, three times over a period of twenty minutes and proceeded to wait outside of Lanchais' door to inquire as to whether he was meeting with several members of her staff. (*Id.* ¶¶ 26, 76, Ex. P.) When Lanchais explained that they were not in his office, plaintiff stated that "that was not true" because she had seen two kitchen workers, Livingston Allen and Herbert Gudiel, leave his office. (*Id.* ¶ 26, Ex. P.)

This incident led to plaintiff's second written reprimand on June 10, 1999, for acting "in an insubordinate manner, willful disregard and disrespect toward the executive chef." [2] (*Id.* ¶ 27, Ex. Q.) She was warned that any future infraction would lead to either suspension or termination. (*Id.*) That same day, Allen also lodged a complaint against plaintiff. He claimed that she called him into her office the night of June 7th to ask him why he and another kitchen worker were complaining about her to Lanchais. (*Id.* ¶ 28, Ex. R.) He claimed that he was scared of being alone with her in the kitchen because she would become "hysterical," and begin "screaming and crying" because everyone was "out to get her." He subsequently called Lanchais to resign. (*Id.* ¶ 29, Ex. S; Allen Aff. ¶¶ 6–7.)

Lanchais then told plaintiff that her continued employment at the Hotel was no longer a viable option and subsequently gave her the choice either to resign or be fired. (Def. Rule 56.1 Stmt. ¶ 7; Lyness Aff. ¶¶ 4, 64; Ehler Dep. at 124.) On June 16, 1999, plaintiff chose to resign. Defendant argues that it had to fire plaintiff because of her inability to get along with her coworkers. (Lyness Aff., Ex. A.) Plaintiff claims that she was terminated as a result of her gender and the fifteen to twenty complaints (Pl. Dep. at 391) she made to Lanchais and Karen Ehler, Director of the Human Resources Department, about her abusive work environment. (Lyness Aff., Ex. A.)

Defendant placed an advertisement in its database to fill the position. (Lyness Aff. ¶ 66; Ehler Dep. at 138–39.) All individuals that applied for the position were men (Lyness Aff. ¶ 66; Ehler Dep. at 208), thus plaintiff was replaced by a male, Einar Gudmundsson (Lyness Aff. ¶ 66; Ehler Dep. at 111), who transferred from defendant's hotel in Atlanta. (Lyness Aff. ¶ 66; Ehler Dep. at 138.)

## I. *Plaintiff's Claims of Harassment and Gender Discrimination*

Plaintiff claims that during the course of her employment she was continuously discriminated against and harassed by Lanchais and her coworkers. Plaintiff cannot recall any specific dates, but argues that on separate occasions in 1998, Lanchais stated: (1) that "you wanted to do a man's job, you better make sure you have what it takes in your pants to do it"; (2) that her food presentation was "too girly" because there were too many flowers on the plate; (3) that she was very "emotional," could

---

**2.** Defendant argues that plaintiff received three write-ups during her employment. Defendant submits another written reprimand, dated May 18, 1999, whereas Pablo Rojas, a banquet kitchen employee, complained that he was scared by the manner in which plaintiff spoke to him. (Lyness Aff. ¶ 20, Ex. J.) However, this document was not signed by the associate, manager or a witness. (*Id.*) Rojas avers that he did not enjoy working with plaintiff because of the abusive way in which she spoke to him (Rojas Aff. ¶ 4), but does not refer to the May 18, 1999 memorandum. Accordingly, the Court will not consider this evidence.

not "manage the kitchen" and advised plaintiff to "go home" after a heated argument between the two had erupted (Lyness Aff., Ex. A; Pl. Stmt. Undisp. Mat. Facts ¶ 81; Pl. Dep. at 430–31, 434); (4) that plaintiff was "just jealous" when she complained that she was not given a formal invitation to view the other chefs' food presentations (Lyness Aff., Ex. A; Pl. Stmt. Undisp. Mat. Facts ¶ 81); and (5) that she should "buy ... some women's coats, with the shape to it [because] ... [s]he is a woman." (Pl. Stmt. Undisp. Mat. Facts ¶ 81; Pl. Dep. at 422.)[3] She also claims that he announced her financial information in front of her coworkers in an effort to embarrass plaintiff and cause severe emotional distress. (Pl. St. Undisp. Mat. Facts ¶ 81; Pl. Dep. at 443–49.)

In 1998, John Goodwin, Banquet Room Chef de Partie, also allegedly told plaintiff "never send a woman to do a man's job." When plaintiff expressed her shock as to what had been said, Goodwin responded "it is true." (Pl. Stmt. Undisp. Mat. Facts ¶ 81; Pl. Dep. at 438–39.)

Plaintiff also alleges that she was treated differently from her male counterparts, namely Al Lanza, Woodlands Restaurant lead cook, and Robert Colletti, Woodlands Restaurant Assistant Sous Chef.[4] First, plaintiff claims that she was denied a promotion on the pretext that subordinates had complained about her, whereas Lanza and Colletti were promoted after they had each been accused of racial discrimination by a subordinate. (Pl.Stmt.Undisp.Mat.Facts.¶¶ 50–51.) Lanza, hired two months prior to plaintiff, was promoted from Woodlands Restaurant Sous Chef to Woodlands Restaurant Chef. (*Id.* ¶¶ 43–49, 51; Iaia Aff. ¶¶ 14–15, Exs. M, N) prior to December 1998. On February 6, 1999, Colletti was promoted to Woodlands Restaurant Sous Chef. (Pl. Stmt. Undisp. Mat. Facts ¶ 51; Iaia Aff. ¶ 17, Ex. P.)

Second, plaintiff claims that she was forced to decrease both food procurement and labor costs in the Banquet Room, whereas Lanza was not required to do the same in the Woodlands Restaurant. (Pl. Dep. at 539–45.) She claims that she was forced to do so even though the Banquet Room was busier than the Woodlands Restaurant and had a smaller staff. When plaintiff pointed this out to Lanchais, she was told to "make it happen for Al." (Lyness Aff., Ex. A.)

Third, plaintiff alleges that Lanchais refused to allow her and Allen, the Banquet Room Assistant Sous Chef, to attend a culinary class in Boston, Massachusetts before Lanza and Colletti participated. (Pl. Dep. at 520–21.) As a result, plaintiff alleges that she was denied the opportunity to accumulate credits for membership in the Culinary Institute of America ("CIA"). (*Id.* at 513–14; Lyness Aff., Ex. A.) The parties dispute whether the class was connected with the CIA or the American Culi-

---

**3.** Plaintiff also bases her claim on the testimony of Ruben LaBastida, a member of her staff, that he had heard coworkers call her a "bitch" and "fucking bitch." (Pl. Stmt. Undisp. Mat. Facts ¶¶ 68–69; LaBastida Dep. at 114.) Although LaBastida testified that he overheard someone call plaintiff a bitch at some point either during or after a conversation held between plaintiff and the unidentified coworker (LaBastida Dep. at 114), plaintiff has not alleged that she heard these statements or was harassed by them. Therefore, they cannot have directly affected plain-

tiff's perception of the work environment. Moreover, the staff members who used the terms are not identified, and there is no evidence that plaintiff's supervisors were aware of their use.

**4.** The Woodlands Restaurant is a separate kitchen in the Hotel which prepared the food for the Hotel's restaurant and room service. It also had a separate food budget from the Banquet Room and a larger staff of approximately ten members.

nary Federation and whether plaintiff could have in fact acquired credits for either society. (Lanchais Aff. ¶ 9; Pl. Dep. 513–14.) Plaintiff also claims that in 1999, Lanchais, Lanza and Colletti attended an annual food show in New York City without asking her if she wanted to accompany them. (Lyness Aff., Ex. A.) However, she does not dispute the allegation that the food show was not affiliated with the Hotel.

Fourth, every year defendant conducts a confidential survey, the Associate Opinion Survey ("AOS"), in which the staff rates the management as well as other aspects of the Hotel's operations. (Lanchais Dep. at 148). In 1998, Lanchais and Tim Cooper, former Food and Beverage Director, blamed plaintiff for the low rating given by the AOS and were prepared to circulate it to plaintiff's staff in the Banquet Room. (Lyness Aff., Ex. A.) The parties dispute whether the results for the Banquet Room and Woodlands Restaurant were combined, thereby preventing their determination of the source of the problem. (Id.; Ehler Dep. at 57–58.) In any event, this was the first time that the AOS would have been redistributed to the staff of any manager in the Hotel. (Pl. Stmt. Undisp. Mat. Facts ¶ 85; Lanchais Dep. at 153.) Both parties concede that the AOS was never given to plaintiff's staff because plaintiff was terminated before it was to have been done. (Pl. Stmt. Undisp. Mat. Facts ¶ 84; Lanchais Dep. at 152.)

Finally, plaintiff claims that she complained to Lanchais and Ehler approximately fifteen to twenty times concerning her work environment. The only documented complaint concerns an incident when one of plaintiff's kitchen workers, Kittikorn Marbumrung, hit her on the shoulder as she was entering the walk-in refrigerator. (Lyness Aff. ¶ 21, Ex. K). At the time, Marbumrung alleged that he was only joking with plaintiff. (Id.) The basic allegation remains undisputed.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(d). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the non-moving party. City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 45 (2d Cir.1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250, 106 S.Ct. at 2510. At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. See Carey

*v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990). However, summary judgment should be employed sparingly in employment discrimination cases where the employer's intent, motivation, or state of mind is at issue. *See Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)).

## II. *Title VII and NYHRL*

■ Title VII of the Civil Rights Act of 1964 provides that it is unlawful for "an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's sex . . . ." 42 U.S.C. § 2000e–2(a)(1). Section 296(1)(a) of the NYHRL provides the same protection to an employee. New York courts require the same standard of proof for claims brought under the NYHRL as those brought under Title VII. Therefore, the claims will be analyzed in tandem and our holding with respect to plaintiff's Title VII claims apply with equal force to her NYHRL claims. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Leopold v. Baccarat, Inc.,* 174 F.3d 261, 264 n. 1 (2d Cir.1999); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995).

### A. *Disparate Treatment*

Disparate treatment claims pursuant to Title VII are subject to the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this scheme, the plaintiff bears the initial burden to establish, by a preponderance of the evidence, a prima facie case of employment discrimination. If the plaintiff satisfies her burden, a presumption arises that "the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged unlawful employment action. *See St. Mary's,* 509 U.S. at 507, 113 S.Ct. at 2747. The defendant's burden is also minimal. "Any legitimate, nondiscriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir. 1997). "The employer need not *persuade* the court that it was motivated by the reason that it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998) (emphasis in original).

If the defendant satisfies its burden of production, then the presumption of discrimination "simply drops out of the picture." *St. Mary's,* 509 U.S. at 510, 113 S.Ct. at 2749. At this point, a plaintiff may prevail only if she shows by a preponderance of the evidence that the employer's proffered reason is a pretext for discrimination and that it is more likely than not that discrimination was the real reason for the adverse employment action. *See id.* at 515, 113 S.Ct. at 2752. "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093); *Fisher,* 114 F.3d at 1335.

### 1. *Plaintiff's Prima Facie Case*

■ A prima facie case of disparate treatment is established by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was otherwise qualified for the position; (3) an adverse employment action was taken; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. The burden of establishing a prima facie case "is not onerous." *Id.* at 253, 101 S.Ct. at 1094; *Fisher*, 114 F.3d at 1335. The burden is so minimal that some courts simply assume the existence of a prima facie case. *See, e.g., Lacoparra v. Pergament Home Ctrs., Inc.*, 982 F.Supp. 213, 223 (S.D.N.Y. 1997) (Conner, J.).

Plaintiff has satisfied the first and third prongs of her prima facie case. As a woman, she is a member of a protected class and termination is an adverse employment action. Defendant argues that she has not satisfied the second and fourth prongs of her prima facie case. In light of the low burden, we find that plaintiff has made out a prima facie case.

### a. *Qualification for the Position*

■ Defendant claims that plaintiff was not qualified as Banquet Room Sous Chef because she could not adequately supervise the kitchen workers. In support thereof, it submits plaintiff's own deposition testimony in which she stated that the management and supervision of employees is equally as important as cooking. (Pl. Dep. at 305.) Defendant does not claim that plaintiff was fired because of the quality of the food. Indeed, she received "positive" results from guests (Lanchais Dep. at 27–28) and, on several occasions, supervisors described her cooking as "good" and "great." (Lyness Aff. ¶ 64; Ehler Dep. at

120; Lanchais Aff. ¶ 5.) Furthermore, defendant admits that plaintiff improved in the respect of balancing the food and labor budgets. (Lanchais Aff. ¶ 13.)

■ The general rule is that an employee "only needs to demonstrate that she possesses the basic skills necessary for performance of the job." *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir.1991) (citations omitted); *Bucknell v. Refined Sugars, Inc.*, 82 F.Supp.2d 151, 155 (S.D.N.Y.2000) (Conner, J.). Because there is no dispute that plaintiff was a good chef, she has demonstrated that she possesses the basic skills necessary for the job of Banquet Room Sous Chef. Therefore, for purposes of the present motion, she will be deemed qualified for the position. We will consider her relationship with her coworkers and subordinate employees in connection with whether defendant has articulated legitimate business reasons for plaintiff's termination.

### b. *Circumstances Giving Rises to an Inference of Discrimination*

#### (1). *Remarks*

■ Defendant does not argue that an inference of discrimination may not be drawn from statements made by supervisors and coworkers. *See Ralkin v. New York City Transit Auth.*, 62 F.Supp.2d 989, 996 (E.D.N.Y.1999). Instead, defendant argues that the statements made by Lanchais and Goodwin in 1998 constitute nothing more than stray remarks. We disagree.

■ It is well settled that stray remarks, with no nexus to the alleged adverse employment action, do not, without more, establish gender discrimination. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir.1998); *Balut v. Loral Elec. Sys.*, 988 F.Supp. 339, 348–49 (S.D.N.Y.

1997) (Conner, J.), *aff'd,* No. 98–7053, 1998 WL 887194 (2d Cir.1998). In this case, all of the remarks, made by either Lanchais or Goodwin, were made in 1998, at least six months prior to plaintiff's termination. However, those statements are not the only evidence in this case that would support an inference of discrimination. In the respects discussed below, *see infra Part* II.A.1.b.(2).(a)-(b)., plaintiff was treated less favorably than similarly situated male employees. In such a context, the remarks cannot be considered stray. Accordingly, an inference of discrimination arises from such statements as: if "you wanted to do a man's job, you better make sure you have what it takes in your pants to do it;" and "never send a woman to do a man's job."

### (2). *Similarly Situated · Male Employees*

▪▪▪ A plaintiff alleging gender discrimination may raise an inference thereof by showing that the employer treated her less favorably than similarly situated male employees. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir.1999). Whether two employees are similarly situated is an issue of fact for the jury. *See Graham v. Long Island Rail Road,* 230 F.3d 34, 39 (2d Cir.2000). In this case, plaintiff attempts to show: (1) that Lanza and Colletti were promoted even though an employee had filed a complaint of racial discrimination against them (Ehler Aff. ¶ 8; Iaia Aff. ¶ 16, Ex. O; Pl. Stmt. Undisp. Mat. Facts ¶ 50); (2) that she was told to reduce her food and labor costs whereas Lanza was not; (3) that she was excluded from culinary classes that Lanza and Colletti were permitted to attend; (4) that the AOS survey was to be reissued only to her staff members; and

(5) that she was not formally invited to view other chefs' food presentations.

### (a). *Similar Situation*

The first issue is whether plaintiff and Lanza were similarly situated employees. Defendant argues that they were not because their relationship could not satisfy the definition of similarly situated employees, namely that they "must have reported to the same supervisor ... have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." (Def. Mem. Supp. Mot. Summ. J. at 13–14.) We do not agree.

In *Shumway v. United Parcel Serv. Inc.,* 118 F.3d 60 (2d Cir.1997), the Second Circuit adopted the Sixth Circuit's holding that a person must be "similarly situated in all material respects" in order to establish her prima facie case. *Id.* at 64 (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583–84 (6th Cir.1992)). However, the Court of Appeals never expressly adopted the Sixth Circuit's definition of "all material respects" as described by defendant and recently, the Second Circuit explained that it never intended to adopt such a stringent test. *See Graham,* 230 F.3d at 39 n. 1.

▪▪▪ Employees are similarly situated in all material respects if there is an " 'objectively identifiable basis for comparability' ... a reasonably close resemblance of the facts and circumstances;" the situations of the individuals do not have to be identical. *Id.* at 40 (quoting *Cherry v. American Tel. & Tel. Co.,* 47 F.3d 225, 229 (7th Cir.1995)). A plaintiff must show that she and those "similarly situated" were subject to the same workplace standards

and that plaintiff's conduct was of seriousness comparable to that of conduct which went undisciplined. *See Graham,* 230 F.3d at 39–40 (citing *Norville,* 196 F.3d at 96).

In this case, there is an objectively identifiable basis for comparison between Lanza and plaintiff. Defendant concedes that Lanza and plaintiff were the lead cooks in their respective kitchens at the Hotel (Def. Reply Mem. at 4) and that they answered to the same supervisor, Lanchais, and were subject to the same workplace standards. Therefore, under *Graham,* the employees were similarly situated in all material respects.

Even if we were to adopt defendant's rigid definition of "similarly situated in all material respects" as established by *Mitchell,* it would still be satisfied in this case. It is undisputed that a subordinate employee had lodged a complaint against Lanza for racial discrimination. By December 1998, the time of Lanza's alleged promotion, *see infra Part* II.A.1.b.(2).(b)., plaintiff had been the subject of only one written complaint by a kitchen worker. (Lyness Aff. ¶ 17, Ex. E; Sandarciero Aff. ¶ 6.) In the respect of complaints by subordinates, plaintiff and Lanza were similarly situated.

Defendant argues that the plaintiff and Lanza were not similarly situated because Lanza's "skills as a sous chef (i.e., not just his culinary skills but his management and interpersonal skills as well), were excellent" whereas plaintiff was the source of continuous complaints by coworkers. (Def. Mem. Supp. Mot. Summ. J. at 13.) Lanza had also made a great impact on the quality of the food in the Woodlands Restaurant whereas plaintiff failed to achieve the same results in the kitchen. (Def. Reply Mem. at 4.)

However, it is an issue of fact as to whether someone's management and interpersonal skills could be described as "excellent" when there has been a racial discrimination complaint lodged against him by a subordinate employee. It is also a question of fact whether plaintiff's cooking skills are equivalent to Lanza's, when they have been defined by her supervisors as "good" and "great" and received "positive" results from guests. Taking all inferences in favor of plaintiff, we must assume that plaintiff and Lanza's cooking skills were substantially equal and that they were in fact similarly situated.

Because defendant does not attempt to distinguish plaintiff and Colletti's situations, we will not engage in any unnecessary speculation as to whether they were similarly situated.

### (b). *More Favorable Treatment*

The second issue is whether Lanza was treated more favorably than plaintiff. Plaintiff testified that when she was hired she was promised that she would be promoted to Banquet Room Chef by December 1998. (Pl. Dep. at 269, 277–78, 470–71.) However, at the time her probationary period ended, she was not promoted and plaintiff's supervisors denied ever making the promise. (*Id.* at 278–82.) Plaintiff alleges that at some point between September and December 1998, Lanza was promoted from Woodlands Restaurant Sous Chef to Woodlands Restaurant Chef. (Pl. Dep. at 296, 473–75.)

Plaintiff argues that she was not promoted in the Banquet Room by December 1998 because of her gender (Pl. Dep. at 290); "[b]ecause all the elements were in line; our food cost was in line, our labor was in line, guests comments were very good, accelerated business because of that, and felt that because Al Lanza, which was two weeks prior to me getting hired, he had already received his promotion, I felt it's my turn now." (*Id.*) [sic].

There is a question of fact as to whether Lanza was actually promoted during plaintiff's employment and therefore treated more favorably than plaintiff. Defendant claims that Lanza was hired as Chef de Cuisine, commonly known as Restaurant Chef (Def. Mem. Supp. Mot. Summ. J. at 13; Pl. Stmt. Undisp. Mat. Facts. ¶ 48; Lanchais Dep. at 17), and·promoted only once to Executive Sous Chef in October 1999, three months after plaintiff left defendant's employ. (Ehler Aff: ¶ 8; Lanchais Dep. at 16–19; Ehler Dep. at 42.) [5] In contrast, plaintiff argues that Lanza was hired as Woodlands Restaurant Sous Chef and promoted to Woodlands Restaurant Chef at some ·point between September and December 1998. (Pl. Stmt. Undisp. Mat. Facts ¶¶ 43–49, 51; Pl. Dep. at 473–75.) In support of her position, plaintiff submits a memorandum dated March 25, 1998, describing Lanza's position as "Sous Chef/Woodlands Restaurant" (Pl. Stmt. Undisp. Mat. Facts ¶ 48; Iaia Aff. ¶ 14, Ex. M), and a memorandum, dated April 22, 1999, describing it as "Restaurant Chef." (Pl. Stmt. Undisp. Mat. Facts ¶ 49; Iaia Aff. ¶ 15, Ex. N.) The Court observes that defendant's employees repeatedly refer to Lanza as being hired as "[S]ous [C]hef" (Ehler Aff. ¶ 8).

Because this Court cannot make findings of fact on a motion for summary judgment, but instead must draw all inferences in favor of the non-moving party, we assume that Lanza was actually promoted from Woodlands Restaurant Sous Chef to Woodlands Restaurant Chef.[6] Based on that assumption, he was treated more favorably than plaintiff. Accordingly, plaintiff has established her prima facie case and it is unnecessary to address the four remaining respects in which plaintiff claims she was subjected to disparate treatment.

██ The Court agrees that "[u]nlike other conditions and privileges of employment, a promotion is not something to which every employee is automatically entitled as a matter of course ... she does not automatically become entitled to be promoted by a virtue of her seniority." *Davis v. Bowes,* No. 95 Civ. 4765, 1997 WL 655935, at *19 (S.D.N.Y. Oct.20, 1997), *aff'd,* No. 97–9496, 1998 WL 477139 (2d Cir. July 22, 1998). Therefore, the facts do not support a claim for failure to pro-

---

5. Acts of discrimination that occurred after plaintiff's termination are not relevant to the present controversy. *Cf. Mauro v. Southern New England Telecomm., Inc.,* 208 F.3d 384, 386 n. 1 (2d Cir.2000) (affirming the district court's refusal to consider claims relating to position openings that arose after the filing of the complaint where plaintiff never sought to amend pleadings) (citing *Grain Traders, Inc. v. Citibank N.A.,* 160 F.3d 97, 105–06 (2d Cir.1998); *In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 402 (2d Cir.1994)).

6. To the extent plaintiff raises a claim of failure to promote to Restaurant Chef, it is without merit. Plaintiff's Equal Employment Opportunity Commission ("EEOC") affidavit and federal court complaint stated that she was denied a promotion and attendant raise to Chef de Cuisine which went to a less qualified male employee, Lanza. (Lyness Aff., Exs. A,

B.) Plaintiff claims she was better qualified than Lanza based upon her superior culinary skills and generation of more revenue as well as Lanza's use of profanity and his "gruff tone." (Lyness Aff. ¶ 35; Pl. Dep. at 475–78, 498, 504.)

If plaintiff is arguing that she should have been promoted to Chef de Cuisine or Restaurant Chef, her claim fails because she does not submit any evidence that showed she even applied for the position of Restaurant Chef. *See Mauro,* 208 F.3d at 386; *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 709 (2d Cir.1998). As stated above, plaintiff's entire testimony concerns the failure to be promoted to Banquet Room Chef. She never requested the position of Restaurant Chef. *See Brown,* 163 F.3d at 710. Therefore, any claim for an attendant raise is without merit.

mote to Banquet Room Chef.[7] They are sufficient to show that a similarly situated male employee was treated more favorably than plaintiff thereby supporting an inference of discrimination.

## 2. *Legitimate Business Reasons*

The issue is whether defendant has articulated a legitimate business reason for terminating plaintiff. We find that it has.

 Defendant argues that it terminated plaintiff based upon "her harsh demeanor, her exceptionally poor interpersonal and supervisory/management skills, and her refusal to change the manner in which she dealt with people in the workplace, she was completely unable to get along with, adequately supervise and effectively manage the individuals who staffed the Renaissance Westchester's Banquet kitchen during the time she was employed there." (Def. Reply Mem. at 3.)

The Second Circuit has stated that a "profound inability to get along with her coworkers .... represents a legitimate, nondiscriminatory reason for an employment decision." *Meiri,* 759 F.2d at 997 (*citing Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 73 (1st Cir.1984); *Frausto v. Legal Aid Soc'y,* 563 F.2d 1324, 1328–29 (9th Cir.1977)); *see Lawrence v. Shubert Org., Inc.,* No. 94 Civ. 2591, 1996 WL 107298, at *7 (S.D.N.Y. March 12, 1996), *aff'd,* No. 96–7438, 1996 WL 576004 (2d Cir.1996); *Wilcox v. Runyon,* No. 94–Cv–1921, 1995 WL 468270, at *4 (E.D.N.Y.

July 31, 1995); *Bernard v. Ernst & Whinney,* No. 88 Civ. 4028, 1990 WL 9280, at *6 (S.D.N.Y. Jan.30, 1990). This factor by itself is sufficient to rebut a prima facie case. *See Williams v. McCausland,* No. 90 Civ. 7563, 1995 WL 548862, at *13 (S.D.N.Y. Sept.15, 1995) ("Specifically, refusal to obey superiors, inability to get along with coworkers, and failure to complete work in a timely manner are each, standing alone, sufficient to rebut a *prima facie* case.").

Plaintiff's employment file included two written reprimands for using disrespectful language with Lanchais and her coworkers. (*Id.* ¶¶ 19, 27, Exs. H, Q.) She told one kitchen worker that he was "not like most Italians" (*Id.* ¶ 17, Ex. E; Sandarciero Aff. ¶ 6) and another that he was "stupider" than her dog. (Lyness Aff. ¶ 18, Ex. G.) On more than one occasion she received counseling on how to treat her coworkers. (*Id.* ¶¶ 17, 19, Ex. I.). Kitchen workers also lodged complaints concerning her cleanliness in the kitchen. (*Id.* ¶ 22, Ex. L.) Three times during April and May 1999, meetings were held at plaintiff's request, between plaintiff, Lanchais and several different kitchen workers, to discuss their "attitudes" towards her and the yelling and banging of equipment that occurred in the kitchen. (*Id.* ¶¶ 23–25, Exs. M, N, O.)

Moreover, in addition to the submission of plaintiff's employment file, rife with complaints made against her by her staff,

---

**7.** At one point during her deposition, plaintiff testified that "Chef de Cuisine" is synonymous with "Banquet Chef." Plaintiff's prima facie case for the failure to promote to Banquet Chef also fails because plaintiff has proffered no evidence that defendant was seeking applicants for the position of Banquet Room Chef (Lyness Aff. ¶ 49; Ehler Dep. at 40–41) or that anyone else, including Lanza, was ever hired for the position. *See Meiri,* 759 F.2d at 996.

At the present time, a man replaced plaintiff in her position of Banquet Room Sous Chef and was not hired for the position as Banquet Room Chef. Furthermore, during plaintiff's employ, no one held the position of Banquet Room Chef. Plaintiff, as Banquet Room Sous Chef, remained in the highest position in the Banquet Room. Therefore, any claim for an attendant raise is without merit.

defendant submits the affidavits of four kitchen workers who claim that they either resigned or threatened to resign because they could no longer work under plaintiff's supervision. (Allen Aff. ¶ 7; Goodwin Aff. ¶ 6; Gudiel Aff. ¶ 5; Rojas Aff. ¶ 5.) She has been described by her staff as "hysterical" and always thinking someone was "out to get her." Her staff was afraid to be alone with plaintiff. (Lyness Aff. ¶ 29; Allen Aff. ¶¶ 6–7.)

This conclusion is not undermined by the fact that plaintiff may have possessed good cooking skills. The failure of an employee to get along with coworkers rebuts the employee's prima facie case even if the employee's performance ratings were high in other respects. Courts cannot second-guess an employer's business judgment. *See Bills v. Sunshine Wireless Co., Inc.,* 824 F.Supp. 60, 64 (E.D.Va.1993) (holding that the employer provided legitimate business reason for termination of disc jockey employee even though radio ratings were high), *aff'd,* No. 93–1137, 1994 WL 14840 (4th Cir.1994). Therefore, we find that defendant has satisfied its second-stage burden.

### 3. *Pretext*

█ The central issue remaining is whether defendant's articulated business reasons were pretextual. Under *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), in order to prove pretext, it is incumbent on the plaintiff to produce evidence from which a reasonable jury could: (1) disbelieve defendant's proffered reasons for the adverse employment action; and (2) infer that its real reason was unlawful, gender-based discrimination. *See id.* at 146–48, 120 S.Ct. at 2108–09. "But this does not mean that the evidence that the plaintiff used to establish his prima facie case is wiped out; there is no reason

that the plaintiff cannot rely on evidence offered to establish his prima facie case ... subsequently to rebut the employer's ... explanation." *Danzer,* 151 F.3d at 55. At this point, a court "must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination." *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) (quoting *Fisher,* 114 F.3d at 1347).

█ Plaintiff attempts to satisfy her burden by directing the Court's attention to the vast number of inconsistencies in defendant's answers to plaintiff's interrogatories and document demands. It is well settled that a plaintiff may "establish pretext and thereby successfully oppose summary judgment, ... by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action." *Cruse v. G&J USA Publishing,* 96 F.Supp.2d 320, 329 (S.D.N.Y.2000); *see EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir.1994); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 39 (2d Cir.1994). Pretext can also be shown by demonstrating inconsistent statements in contexts other than those made in connection with plaintiff's termination.

There is rarely direct evidence of intent in an employment discrimination case. *See Danzer,* 151 F.3d at 56; *Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir. 1997). " 'Employers are rarely so cooperative as to include a notation in the personnel file' that their actions are motivated by factors expressly forbidden by law.' " *Chambers,* 43 F.3d at 37 (quoting *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989)). Because employers rarely provide a "smoking gun" demonstrating discriminatory intent, *Cham-*

*bers,* 43 F.3d at 37, we must scrutinize all available evidence to find any circumstantial proof that would rebut the employer's legitimate business reasons. *See Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85 (2d Cir.1990). In this case, the obviousness of the inconsistencies, coupled with discriminatory remarks and comparatively favorable treatment of plaintiff's similarly situated male coworkers, is sufficient to establish a factual issue as to pretext.

A number of the inconsistencies on which plaintiff relies are "based largely on statements out of context, and on inapt comparisons between different statements." *See Balut,* 988 F.Supp. at 351 (quoting *Thomson v. Saatchi & Saatchi Holdings, Inc.,* 958 F.Supp. 808, 823 (W.D.N.Y.1997)). For example, Lanchais testified that during the June 1999 incident that led to plaintiff's dismissal, plaintiff twice called him a liar. Although plaintiff argues that none of the supporting documents proves this contention, there is no inconsistency. The supporting memorandum states that after Lanza responded to plaintiff's question as to who was in his office, plaintiff replied "that was not true."

However, plaintiff correctly observes that defendant has submitted wholly inconsistent statements about whether plaintiff ever complained of sexual harassment, discrimination and retaliation. Plaintiff's Interrogatory No. 14 asked defendant to identify "each person you communicated with regarding plaintiff's claims of harassment, discrimination and retaliation against you." (Pl. Stmt. Undisp. Mat. Facts. ¶¶ 17, 21; Iaia Aff. ¶ 6, Ex. E.) Defendant replied that: "[this] interrogatory is unanswerable in that plaintiff did not make any claims of harassment, discrimination or retaliation at any time while she was employed as a sous chef at the Renaissance Westchester Hotel." (Pl.

Stmt. Undisp. Mat. Facts. ¶ 22; Iaia Aff. ¶ 8, Ex. G.) Furthermore, in response to plaintiff's request to "produce all documents concerning all steps taken to investigate Ramos' complaints of discrimination, harassment and retaliation" (Pl. Stmt. Undisp. Mat. Facts. ¶¶ 20, 23; Iaia Aff. ¶ 9, Ex. F), defendant stated that no documents existed "because plaintiff did not at any time during her employment at the Renaissance Westchester Hotel complain about discrimination, harassment and/or retaliation." (Pl. Stmt. Undisp. Mat. Facts. ¶ 24; Iaia Aff. ¶ 9, Ex. H.)

However, defendant's papers submitted in support of the dispositive motion state that *"at least on one occasion* plaintiff complained to the Human Resources Department concerning her relationship with the other kitchen workers and suggested that their treatment of her was attributable to her gender" (Ehler Aff. ¶ 4; Ehler Dep. at 180–81) and that plaintiff "complained to Ms. Ehler on *perhaps one or two occasions* that she felt that she was not respected by the kitchen staff because she was the first and only woman sous chef to have ever worked in the Banquet kitchen." (Def. Reply Mem. at 8) (emphasis added.)

Defendant argues that the inconsistencies are merely "illusory" and that the affirmations submitted in support of this motion did not contradict any prior statements. According to defendant, it originally responded that plaintiff had never complained about discrimination because defendant had interpreted the question as asking whether it believed that plaintiff had, in fact, been the subject of gender discrimination and sexual harassment. Defendant's explanation is dubious at best. The plain meaning of the question asks whether plaintiff had lodged any complaints regarding her work environment, not whether defendant would admit that

its employees' actions had in fact violated plaintiff's civil rights.[8] The stark nature of the inconsistency seriously diminishes defendant's credibility.

■ Summary judgment should be granted sparingly when intent is at issue. In this case, defendant's inconsistent statements, coupled with the discriminatory remarks and more favorable treatment of similarly situated male employees, is sufficient to create a triable issue as to pretext. A jury could disbelieve defendant's proffered reasons for terminating plaintiff because of the lack of credibility of its responses to plaintiff's interrogatory questions and document demands. From the discriminatory remarks and favorable treatment of Lanza, a jury could infer that defendant's real reason for terminating plaintiff was her gender. We admit that this case presents a close question and do not imply that plaintiff will be able to prove her case at trial. However, when a close question is presented, the Court must rule in favor of the non-moving party. Accordingly, defendant's motion for summary judgment on plaintiff's gender discrimination claim is denied.

### a. *Same–Actor Inference*

Defendant attempts to persuade this Court that a "same-actor inference" should be drawn in this case. *Grady,* 130 F.3d at 560. This inference strongly suggests that discrimination was unlikely. "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Id.* This inference remains significant where the time period between the hiring and firing is less than two years. *See Campbell v. Alliance Nat'l Inc.,* 107 F.Supp.2d 234, 248–49 (S.D.N.Y.2000) (nine months) (citing *Carlton v. Mystic Trans., Inc.,* 202 F.3d 129, 138 (2d Cir.2000)); *see, e.g., Lenhoff v. Getty,* No. 97 Civ. 9458, 2000 WL 977900, at *5 (S.D.N.Y. July 17, 2000) (eleven months); *Irvine v. Video Monitoring Servs. of America, L.P.,* No. 98 Civ. 8725, 2000 WL 502863, at **1, 8 (S.D.N.Y. Apr.27, 2000) (fourteen months); *Hauptman v. Concord Fabrics, Inc.,* No. 98 Civ. 1380, 1999 WL 52970, at *6 (S.D.N.Y. July 22, 1999); *Shabazz–Allah v. Guard Mgmt. Serv.,* No. 97 Civ. 8194, 1999 WL 123641, at *4 (S.D.N.Y. March 8, 1999) (two years), *aff'd,* No. 99–7371, 1999 WL 1012402 (2d Cir. Oct.20, 1999); *McKinney v. Lanier Worldwide, Inc.,* No. 94 Civ. 8139, 1998 WL 677544, at *2, 5 (S.D.N.Y. Sept. 29, 1998) (two years); *Dedyo v. Baker Eng'g N.Y., Inc.,* No. 96 Civ. 7152, 1998 WL 9376, at *7 (S.D.N.Y. Jan.13, 1998) (three years). The "underlying rationale for the inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class." *Watt v. New York Botanical Garden,* No. 98 Civ. 1095, 2000 WL 193626, at *7 (S.D.N.Y. Feb.16, 2000) (citations omitted).

■ It would not be an abuse of discretion to accept the same-actor inference in this case. It is applicable as long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff. *See Campbell,* 107 F.Supp.2d at 250; *Ralkin,* 62 F.Supp.2d at 1000. In this case, plaintiff was terminated one year

---

**8.** Furthermore, defendant did not verify its interrogatory answers in accordance with FED. R. CIV. P. 33(b), which requires the answers to be signed by the person making it. On four separate occasions, plaintiff sent letters to defendant requesting verification. (Pl. Stmt. Undisp. Mat. Facts ¶¶ 26–30; Iaia Aff. ¶¶ 10–13, Exs. G, I, J, K, L.) On September 15, 2000, this Court ordered defendant to comply with FED. R. CIV. P. 33. To date, no such verification has been provided. (Pl. Stmt. Undisp. Mat. Facts ¶¶ 31–32.)

after she was hired. Lanchais testified that he was substantially involved in the hiring process, along with Ehler, Cooper, and John Williams, former Hotel Manager. Lanchais, Executive Chef of the Hotel, had the final determination as to whether plaintiff should be hired as Banquet Sous Chef. (Lanchais Dep. at 37–39.) It is undisputed that he made the ultimate decision that led to plaintiff's termination. Because Lanchais was substantially involved in hiring and firing her one year later, there is a strong inference that his decision to fire plaintiff was not made with any discriminatory animus.

However, the same-actor inference is merely plausible and should not be used as a substitute for a thorough factual inquiry. *See Copeland v. Rosen,* 38 F.Supp.2d 298, 305 (S.D.N.Y.1999); *Watt,* 2000 WL 193626, at *7. "[I]t is plausible that a supervisor who has not previously worked with members of a certain protected class would come to realize his or her animus toward individuals in that group only upon actually hiring and working with such persons." *Copeland,* 38 F.Supp.2d at 305.

█ Although plaintiff has not proffered any reasons why this Court should not apply the inference, we decline to do so in this case. Plaintiff was the first woman Sous Chef at the restaurant. It is plausible that Lanchais could have developed an animus toward women only upon working with them. Defendant submits that over the past ten years it has employed approximately thirty-three women in managerial positions, five of whom held positions of: Restaurant Manager, Assistant Restaurant Manager and Executive Steward during the time of Lanchais' employment as Executive Sous Chef. (Ehler Aff. ¶ 2.) However, contrary to defendant's assertion, there is no testimony that any of them worked directly with Lanchais. Sylvia Coronado, Executive Steward and manager of seven-

teen employees, testified that her immediate supervisor was Lanza. (Coronado Dep. at 7–8.) Because of the close working relationship between plaintiff and Lanchais and the fact that she was the first woman to hold this position, the inference will not be applied to foreclose a trial of the issue of discrimination.

## B. *Retaliation*

Title VII prohibits an employer from "discriminating against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a). The goal is " 'to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice.' " *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998) (quoting *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)). Plaintiff alleges that she was fired in retaliation for complaining about the above mentioned incidents to Ehler and Lanchais.

█ A claim of retaliation is also subject to the burden-shifting analysis of *McDonnell Douglas. See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996). A plaintiff establishes her prima facie case if she can establish that: (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action. *See id.*

Plaintiff alleges that she complained to Ehler and Lanchais approximately fifteen to twenty times about her work environment. Based upon the inconsistencies in defendant's proffered evidence as to whether plaintiff did in fact make such

claims and the fact that we must construe all facts in the light most favorable to the plaintiff, we will assume that plaintiff made those complaints.

■■■■ Plaintiff has satisfied a prima facie case of retaliation. First, a "protected activity" under Title VII does not have to "rise to the level of a formal complaint." *Cruz*, 202 F.3d at 566. It includes activities of "making complaints to management," *id.* (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990)), and may be in the form of a simple "objection voiced to the employer." *Barcher v. New York Univ. Sch. of Law*, 993 F.Supp. 177, 184 (S.D.N.Y.1998) (quoting *Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 410 (S.D.N.Y.1996)). Therefore, plaintiff's verbal and written complaints to Ehler and Lanchais about her working environment are protected activities under Title VII. Furthermore, a plaintiff only needs to show "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan*, 842 F.2d at 593. In this case, there is no doubt that plaintiff possessed a good faith belief that she was the victim of gender discrimination.

Second, the employer was clearly aware of her complaints. Third, termination obviously constitutes an adverse employment action. Thus, the parties' controversy is centered around whether a causal connection between any of the complaints and plaintiff's termination can be established. Notwithstanding plaintiff's failure to offer any evidence in support thereof, the Court finds that plaintiff has at least established a triable issue of fact as to the existence of a causal connection.

■■■■ A causal connection may be established either "*indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *See Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991) (citations omitted) (emphasis in original). Plaintiff's papers are devoid of any allegations that would establish a temporal proximity between any single complaint and the adverse termination. However, she alleges that she made fifteen to twenty complaints over the course of a year, which is approximately one and one-half complaints per month. A causal connection has been indirectly established. Therefore, plaintiff has established her prima facie case.

■■■ As stated above, the inability to get along with coworkers constitutes a legitimate nondiscriminatory reason for terminating plaintiff. *See supra, Part* II.A.2. However, plaintiff has also satisfied her burden of establishing a factual issue as to whether the articulated reason was pretextual. Plaintiff need only show that a retaliatory motive was a factor in the adverse employment action. *See Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 122 (2d Cir.1996); *Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1254 (2d Cir. 1987). In this case, defendant's inconsistencies regarding plaintiff's complaints may be an attempt to hide the fact that a retaliatory motive did in fact play a part in the decision to fire plaintiff. Thus, the retaliation claim is probably stronger than the gender discrimination claim because of defendant's denials.

Accordingly, defendant's motion for summary judgment with respect to plaintiff's retaliation claim is denied.

### C. *Hostile Work Environment*

■■■■ Title VII requires employers to provide an atmosphere free of sexual

abuse or hostility. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). In order to establish a hostile work environment, a plaintiff must show conduct that the workplace was so ridden with "discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citations omitted). The victim must not only perceive the environment as subjectively hostile, *see id.* at 21–22, 114 S.Ct. at 370, but the environment must be such that a reasonable employee in the person's shoes would perceive it as hostile. *See Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.1997).

As an initial matter, plaintiff has not proven that she subjectively perceived the environment as hostile. In *Shepard v. Frontier Communications Serv.,* 92 F.Supp.2d 279 (S.D.N.Y.2000) (Conner, J.), this Court found that a plaintiff did not view her environment as hostile when she testified that she believed the comments were "sexist" rather than sexual in nature. *Id.* at 289–90. In this case, plaintiff's entire claim is based upon the fact that she was discriminated against because of her gender. She has not alleged that she perceived the comments were sexual in nature, but rather that they were made because she was a woman.

Moreover, none of the comments allegedly made by plaintiff's coworkers, viewed individually or collectively, would establish a work environment that is so severe and pervasive that it could be considered hostile under Title VII. The Supreme Court has provided a non-exclusive list of factors that should be weighed when determining whether a workplace is permeated with harassment. *See Harris,* 510 U.S. at 23,

114 S.Ct. at 371. These factors include: (1) the frequency and severity of the conduct; (2) whether the conduct was physically threatening, humiliating or merely an offensive utterance; (3) whether it unreasonably interferes with the employee's job performance; and (4) the effect on the employee's psychological well-being. *See id.* at 23, 114 S.Ct. at 371. In other words, "[w]hether the sexual harassment constitutes a Title VII violation is determined from the totality of the circumstances." *Carrerro v. New York City Hous. Auth.,* 890 F.2d 569, 577–78 (2d Cir.1989).

The application of these factors leads us to conclude that Title VII liability cannot be imposed in this case. First, there is no allegation that physical force was being threatened. Although plaintiff complained about Marbumrung hitting her on the shoulder, there was no allegation that the incident was sexual in nature or motivated by anger or contempt. She has never disputed the allegation that he was simply joking around with her. Plaintiff did not even include the allegation in her EEOC complaint, in which all of plaintiff's other allegations were made. This also implies that she did not believe that Marbumrung's act was abusive in nature. Second, plaintiff's work did not suffer. Indeed, her ability to balance her food and labor budgets actually improved over time. (Lanchais Aff. ¶ 13.)

Liability can be imposed only if the comments were severe enough to establish a hostile work environment. In this case, they were not. At most, they were occasional offensive utterances which do not subject the employer to liability. *See Harris,* 510 U.S. at 22, 114 S.Ct. at 371. In order to establish a claim of hostile work environment, "[t]he incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero,*

890 F.2d at 577; *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987). There must be more than a minor "isolated incident" or "casual comment" that expresses harassment or hostility. *See Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986).

Plaintiff can only recall that the statements were made sometime in 1998. Therefore, the six statements allegedly made by Lanchais and Goodwin were made over a period of six months. (Pl. Dep. at 414, 434, 438.) The Court recognizes that "even in the absence of specific details about each incident," a finding of liability may still result "if a jury were to credit [plaintiff's] general allegations of constant abuse, which were confirmed by her coworkers." *Torres*, 116 F.3d at 625. However, none of plaintiff's allegation are confirmed by her coworkers. She testified that Brian O'Byrne overheard Lanchais' comment, that "[if] you wanted to do a man's job, you better make sure you have what it takes in your pants to do it," but fails to submit an affidavit or deposition testimony by him confirming the remark. (Pl. Dep. at 415.)

██ We also recognize that a court should not merely inquire into "how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts." *Carrero*, 890 F.2d at 578. The offensiveness of the behavior is a factor that must be considered. *See id.* Therefore, "even a single episode of harassment, if severe enough, can establish a hostile work environment." *Torres*, 116 F.3d at 631 n. 4; *see Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 439 (2d Cir.1999). The plaintiff is required to prove only that the conduct is unwelcome, prompted by gender and severe enough to create an offensive environment. *See Carrero*, 890 F.2d at 578.

In order to demonstrate that the statements were not severe or pervasive, several of the statements should be analyzed in the context in which they were made. For example, in 1998, Lanchais wanted to make sure that all employees had new uniforms. Plaintiff testified that she had to open the buttons on the male chef jacket she had been wearing because it was straighter than the female version and she had been gaining weight. While browsing through a catalogue, Lanchais pointed to the women's section of the catalogue and said to plaintiff: "Why don't we get this type? It's more like for a woman. It's got the shape of a woman." (Pl. Dep. at 424–25.) Because chefs' jackets are supposed to be buttoned (Lanchais. Dep. at 180–81), it is reasonable for a supervisor to suggest a more professional attire to his subordinate employees. *See also Jalal v. Columbia Univ.*, 4 F.Supp.2d 224, 236 (S.D.N.Y.1998) (holding that the mere acknowledgment of a person's gender does not constitute discrimination). Accordingly, a reasonable person would not find this comment abusive.

Similarly, the statements that plaintiff was "emotional," could not "manage the kitchen," and should "go home," are not so severe and pervasive to impose Title VII liability. (Pl. Stmt. Undisp. Mat. Facts ¶ 81; Pl. Dep. at 430.) Plaintiff testified that she was involved in a "heated argument" with Lanchais in which both parties were raising their voices for approximately five minutes. (Pl. Dep. at 430–31.) Lanchais' comments were made when plaintiff, "upset" by the conversation, prepared to leave his office. (*Id.*) Again, it is reasonable for a supervisor to suggest that an employee leave the office if she was upset and could not fulfill her job responsibilities for the remainder of the day.

None of the cases cited by plaintiff contradict this Court's conclusion; indeed,

they actually support it. In *Torres,* the plaintiff complained that the defendant "habitually": 1) described her as a part of the female anatomy; 2) commented about the size of the plaintiff's breasts and buttocks; 3) made sexual innuendos about the plaintiff and remarked to others his desire to have sexual intercourse with her; and 4) remarked to coworkers that when she was absent she was probably performing sexual favors. 116 F.3d at 628. Furthermore, in *Cruz,* the plaintiff demonstrated that she and other women co-workers[9] were *regularly* subjected to harassment, including, *inter alia,* statements that "her nipples [were] erect," 202 F.3d at 564, and that a supervisor would look the women "up and down" and move toward them in such a way that they would "end up against the wall." *Id.* at 571. In contrast, the comments, the most offensive of which was "[if] you wanted to do a man's job, you better make sure you have what it takes in your pants to do it," while inappropriate in the workplace, do not establish a hostile work environment. *See also Irvine,* 2000 WL 502863, at *1, 4 (holding that four insulting e-mails which described plaintiff as a "wrinkled-up, hairy upper-lipped neighbor and co-worker," "grave-lady," "wrinkled but aged babe," and that she "looks like Mickey Mantle just before the time he received his liver transplant," were not severe enough to establish liability under the Age Discrimination in Employment Act).

Contrary to plaintiff's assertion, not all claims of hostile work environment survive summary judgment. "Title VII is . . . not intended to act as a general civility code," *Shepard,* 92 F.Supp.2d at 289, and "should not be exploited through misuse and misapplication." *Dean v. Westchester County District Attorney's Office,* 119 F.Supp.2d 424, 430 (S.D.N.Y.2000) (Conner, J.). Accordingly, defendant's motion for summary judgment with respect to plaintiff's hostile work environment claim is granted.

### 1. *Employer Liability*

Plaintiff argues that defendant breached its affirmative duty to timely investigate complaints of harassment and discrimination and therefore is liable as a matter of law. We agree that every employer has an affirmative duty to eliminate harassment in the workplace. However, we do not agree that the failure to investigate imposes liability as a matter of law.

When a supervisor creates a hostile work environment, an employer may be held vicariously liable. *See Faragher v. Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). In *Snell,* the Court of Appeals held that "once an employer has knowledge of a . . . combative atmosphere, he has a duty to take reasonable steps to eliminate it." 782 F.2d at 1104. The failure to do so "*may* allow a jury to impose liability on the employer." *Malik v. Carrier Corp.,* 202 F.3d 97, 105 (2d Cir.2000) (emphasis added); *see Agosto v. Correctional Officers Benevolent Ass'n,* 107 F.Supp.2d 294, 307 (S.D.N.Y.2000). Contrary to plaintiff's assertion, the Second Circuit has never stated that liability *must* be imposed when the employer fails to investigate a sexual harassment claim. *See Thomlison v. Sharp Elecs. Corp.,* No. 99 Civ. 9539, 2000 WL 1909774, at *4 n. 2 (S.D.N.Y. Dec.18, 2000). In any event, the issue of defendant's vicarious liability has no bearing on this case because plaintiff

---

**9.** A plaintiff may establish a claim for hostile work environment by showing that the harassing conduct was directed at other members of the plaintiff's protected group. *See Cruz,* 202 F.3d at 570.

has proffered no evidence that would establish a hostile work environment claim.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted with respect to the hostile work environment claim and denied with respect to the gender discrimination and retaliation claims.

SO ORDERED.