**Barry JONES, Plaintiff,**

v.

**YONKERS PUBLIC SCHOOLS, Dario DiBattista and Thomas Tarricone, Defendants.**

**No. 02 CIV. 3499(WCC).**

United States District Court,
S.D. New York.

July 21, 2004.

---

Goodstein & West (Paula Johnson Kelly, Esq., Of Counsel), New Rochelle, NY, for Plaintiff.

Donoghue, Thomas, Auslander & Drohan (Vincent P. D'Andrea, Esq., Lawrence W. Thomas, Esq., Of Counsel), Scarsdale, NY, for Defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Barry Jones brings this action for injunctive relief, compensatory damages and attorney's fees against defendants the Yonkers Public Schools ("Yonkers"), Dario DiBattista and Thomas Tarricone alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. §§ 1981 and 1983, and the New York Human Rights Law (the "NYHRL"), N.Y. Exec. Law § 290 *et seq.*[1] Plaintiff alleges that his employment was unlawfully terminated because of his race and in retaliation for engaging in protected activity. (Complt. ¶ 1.)

---

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367(a). It is undisputed that Yonkers is an "employer" subject to Title VII and the NYHRL. (Complt. ¶¶ 8–9; Answer ¶ 3.) Plaintiff filed a charge of discrimination with the New York State Division of Human Rights (the "State"), which was cross-filed with the Equal Employment Opportunity Commission (the "EEOC"). The United States Department of Justice issued to plaintiff a right-to-sue letter on February 21, 2002, and the State discontinued its investigation on March 12, 2002. (Complt. ¶ 13; Answer ¶ 6.)

Defendants now move pursuant to FED. R. CIV. P. 56 for summary judgment dismissing plaintiff's Complaint in its entirety. For the reasons set forth herein, we grant defendants' motion for summary judgment dismissing plaintiff's racial discrimination claims, but deny that motion as to plaintiff's retaliation claims.

## BACKGROUND

Viewed in the light most favorable to the non-moving plaintiff, the record reveals the following facts. Plaintiff is an African–American male who worked for Yonkers as a probationary full-time custodial worker at the Foxfire Elementary School ("Foxfire") from February 23, 2000 through May 16 of that year. (Complt. ¶¶ 14–15, 17; Answer ¶¶ 7, 9.) Defendant DiBattista is a white man, employed by defendant Yonkers, who held the position of Assistant Supervisor of Custodians and supervised plaintiff and defendant Tarricone. (Complt. ¶¶ 11, 20; Answer ¶¶ 5, 11.) Defendant Tarricone is a white man, also employed by Yonkers, who held the position of Custodian II and was plaintiff's immediate supervisor. (Complt. ¶¶ 12, 21; Answer ¶¶ 5, 11.)

On the recommendation of James Grosso, then Yonkers's Assistant Superintendent for School Facilities and Operations, plaintiff applied for the custodial worker position in October 1999. (Defs. Rule 56.1 Stmt. ¶ 2; Pl. Resp. Rule 56.1 Stmt. ¶ 2.) Plaintiff was interviewed by DiBattista and Robert Altmayer, another custodial supervisor, both of whom recommended his hiring. (DiBattista Dep. at 20; Kelly Decl., Ex. 1.) Thereafter, plaintiff was hired as a probationary custodial worker and reported to work at Foxfire under the supervision of Tarricone on February 23, 2000. (Defs. Rule 56.1 Stmt. ¶ 3; Pl. Rule 56.1 Stmt. ¶ 3.) Plaintiff was assigned to replace Timothy Synan, a white man who was being transferred to a high school. (Kelly Decl., Ex. 5; Defs. Rule 56.1 Stmt. ¶ 4; Pl. Rule 56.1 Stmt. ¶ 4.) Tarricone did not train plaintiff, but assigned Synan to do so before he left for his new assignment.[2] (Jones Dep. at 24; Tarricone Dep. at 47.) Including plaintiff, there were four custodial workers assigned to Foxfire; two were white men, and plaintiff and Lawrence Farrell were African–American men. Plaintiff worked during the day, while Farrell worked the night shift. (Defs. Rule 56.1 Stmt. ¶ 5; Pl. Resp. Rule 56.1 Stmt. ¶ 5.) One of plaintiff's primary areas of responsibility was the cleaning of the school cafeteria. (Jones Dep. at 77.)

It is undisputed that plaintiff's brief career at Foxfire has been marked by less than harmonious interpersonal relations with some of his supervisors and co-workers. Plaintiff incurred his first reprimand, documented in a March 3, 2000 memorandum by Tarricone, for having his brother inside the school building at 5:30 p.m. on March 2 in violation of the school rules.[3] (Tarricone Aff. ¶ 16; Defs. Rule 56.1 Stmt., Ex. F; Pl. Resp. Rule 56.1 Stmt. ¶ 6.) Plaintiff's relationship with Marcia Weaver, the cafeteria manager, was particularly acrimonious. Plaintiff complains that

---

**2.** Synan went over the job responsibilities with plaintiff and worked alongside him for three days in plaintiff's first week at Foxfire. (Jones Dep. at 24–25.) Synan also explained to plaintiff attendance procedures, the task schedule and where to obtain cleaning supplies. (*Id.* at 25, 27–29.) According to DiBattista, plaintiff did not receive any other training or orientation. (DiBattista Dep. at 51–53.)

**3.** Plaintiff argues that this reprimand was discriminatory because Bobby Hillman, a white custodian, was permitted to have his family in the building, and Synan had been allowed to have his girlfriend visit him at work. (McBane Aff. ¶ 11.).

Weaver treated him unfairly because she would not give him the free meals and snacks that she gave to Tarricone and Bobby Hillman, another white custodial worker.[4] (Jones Dep. at 75–77.) On March 16, 2000, Weaver heard Jones describe her to another staff member as a "nasty bitch." (Weaver Aff. ¶ 11.) She in turn described him to other employees as, *inter alia*, "trash" and the "scum of the earth." (Baker Decl. ¶ 6.)

Plaintiff's difficulties with the cafeteria staff continued when Weaver saw plaintiff use his floor push broom to sweep garbage and debris off the school cafeteria tables on April 3, 2000. (Weaver Aff. ¶ 6.) Although Weaver admonished him not to do that because it was unsanitary, she again witnessed him cleaning the tables with his broom approximately one or two weeks later; he stopped when she approached. (*Id.* ¶¶ 7–8.) Moreover, plaintiff frequently asked the cafeteria staff for free food and snacks and became belligerent and used profanities when these requests were denied, at one point telling Fields, the cafeteria cashier, to "shut the fuck up or I'll smack you in the face" after becoming angry because she charged him $0.30 for a bottle of water. (Fields Aff. ¶¶ 4–5.) These incidents were reported to Tarricone and to Mary Anne Sullivan, Yonkers's Food Services Supervisor, who made notes, and relayed this information via memorandum on May 12, 2000 to Paul Houle, Yonkers's Supervisor of School Facilities and Operations. (Tarricone Aff. ¶ 12; Sullivan Aff. ¶ 5; Defs. Rule 56.1 Stmt., Exs. A–B.)

Plaintiff also did not get along with Tarricone, his supervisor. Tarricone states that plaintiff complained to him that other custodial workers were on a coffee break while he was working. (Tarricone Aff. ¶ 10.) When Tarricone informed plaintiff that his break was scheduled for a later hour, plaintiff yelled at him. (*Id.*) On what would be his last day at Foxfire, plaintiff yelled at Tarricone and called him a "cheap fuck" after Tarricone would not give him a can of soda that Tarricone had brought to work with him, although Tarricone explained to plaintiff that it was his last can. (*Id.* ¶ 11.) At this point, Tarricone wrote plaintiff up in a May 16 memorandum sent to plaintiff and DiBattista stating that "since [plaintiff] started on 2–23–00 their [sic] was a few times that he had lost his temper." (*Id.;* Defs. Rule 56.1 Stmt., Ex. E.) Plaintiff, however, denies losing his temper or raising his voice to Tarricone. (Jones Dep. at 75.)

DiBattista, who had learned of the cafeteria staff's complaints about plaintiff, also had his own exchanges with him. (DiBattista Aff. ¶ 7.) On May 10, 2000, DiBattista reprimanded plaintiff orally and in writing for talking to a child whom he knew, and for telling the principal about a broken water fountain, rather than following the "chain of command" and reporting the

---

4. Plaintiff states that while working in the cafeteria, he saw Weaver give Tarricone and Hillman sandwiches, cookies, cake, ice cream and other food and not charge them for it. (Jones Dep. at 76–77.) He thought nothing of it until several weeks later when he requested something to eat and was asked to pay for it. (*Id.* at 78.) He asked Shawntanya Fields, the cashier, about this practice; she said she had nothing to do with it and referred him to Weaver. (*Id.* at 84–85.) Fields, however, then advised him not to speak to Weaver

because she thought that Weaver and other unnamed white cafeteria employees were prejudiced against African–Americans. (*Id.* at 84.) Nevertheless, plaintiff confronted Weaver, who stated that she was only giving Tarricone and Hillman credit in advance of payment on Fridays. (*Id.* at 85.) As plaintiff left, another kitchen worker, Rosalind Baker, told plaintiff that Weaver was lying and "she's been giving them white people free food since September." (*Id.;* Baker Decl. ¶¶ 5–8.)

problem to Tarricone.[5] (DiBattista Dep. at 44–45.) Plaintiff states that DiBattista told him: "I don't want you talking to these kids and I don't want you talking to nobody on the staff." (Jones Dep. at 65.) When plaintiff protested, DiBattista said: "You shut your mouth, you push your mop and if you don't like it you can go back to K–Mart or wherever you came from." (*Id.*) After plaintiff left the room, he heard DiBattista say to Tarricone: "I need you to write something. Don't worry, we'll get him out of here." (*Id.* at 66.) Several days later, plaintiff received the write-up from Tarricone following the soda incident.

After consulting with the personnel office, on May 16, 2000, DiBattista came to Foxfire with the intention of transferring plaintiff to another school. (DiBattista Dep. at 72; DiBattista Aff. ¶¶ 8–9.) He met with plaintiff in the presence of Tarricone and requested from plaintiff his keys to the school. (*Id.* ¶ 9.) Plaintiff refused to give the keys to DiBattista, began to yell and scream, and called him a "white son of a bitch." (*Id.* ¶ 10.) Plaintiff then went to see the school's principal, who, he claims, sympathized with him,[6] and then to retrieve some things from his locker before leaving the school grounds. (Jones Dep. at 98, 103.) After gathering his belongings, plaintiff left the school grounds without returning the keys as requested and DiBattista called the police, who recovered them from plaintiff. (*Id.* at 104–06; DiBattista Aff. ¶¶ 10–11.) The police then gave plaintiff a ride to the administration building, where plaintiff met with Grosso and told him about the incident. DiBattista then appeared at Grosso's office, and Grosso sent plaintiff home, but promised an investigation. (Jones Dep. at 106, 108.) This was the last day plaintiff actually worked for Yonkers.[7] (*Id.* at 108–09.)

Approximately one week later, plaintiff met with James Henderson, an African–

---

5. DiBattista said at his deposition that he issued to plaintiff a written reprimand because the chain-of-command rule "was too important an item for him not to remember again." (DiBattista Dep. at 45.)

6. Plaintiff says he went to the office of the principal, Dr. Al Gourier, who stated that he had not heard of any threats by plaintiff. (Jones Dep. at 98.) He states that the principal said to him: " 'Barry, unfortunately in our days we still have people like this. Ever since you came into the building you have been the sole focus of ridicule. Some of these people are racists. You have to fight them.' " (*Id.*) Plaintiff states that the principal told him to call his union representative, who arranged an appointment for him the next day. (*Id.* at 99–101.)

7. In his responding Local Rule 56.1 Statement, plaintiff states only that defendants' statement of the events that transpired during his employment with Yonkers from February to May 2000 "is not supported by the facts and is controverted by the record." (Pl. Rule 56.1 Stmt. ¶ 6.) Citing portions of his Declaration, plaintiff states that he "performed his duties properly and conducted himself appropriately toward Yonkers' employees." (*Id.*) The Declaration does not, however, mention the "nasty bitch" incidents with Weaver or Tarricone and only "denies recollection of any such incident" with Fields. (Jones Decl. ¶¶ 13, 17, 21.) With respect to the May incident with DiBattista, plaintiff states that defendants only "called the police on me to get back the keys, not for any threat." (*Id.* ¶ 17.) The incidents described in defendants' Rule 56.1 Statement and supported by admissible evidence in the record, but unmentioned by plaintiff in either his Rule 56.1 Statement or Declaration are deemed admitted. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003). Moreover, the conclusory statements and denials in plaintiff's Declaration do not create a genuine issue of material fact that will defeat defendants' motion for summary judgment. *See, e.g., Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir.1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000).

American man who was then Yonkers's Executive Director of Personnel, and Dianne Franks, his assistant in charge of non-instructional staffing. (*Id.* at 111–15.) Henderson makes the termination decisions for Yonkers based on his review of the employee's supervisor's recommendation. (Franks Dep. at 53.) At this meeting, Henderson asked plaintiff whether he had: (1) used the "F" word to any cafeteria worker; (2) asked to borrow money from the cook; or (3) told a student to go back to class. (Jones Dep. at 111.) The plaintiff replied in the negative to all three questions. (*Id.* at 112–13.)

Approximately one week after this first meeting, plaintiff was summoned to meet with Henderson and Dr. Herschel Williams, the Deputy Schools Superintendent. (*Id.* at 115–16.) Williams asked about plaintiff's termination papers, which Henderson explained did not exist. (*Id.* at 116.) Williams said plaintiff would be put back to work, and Henderson told him that he would be paid for his time, pay that plaintiff did subsequently receive. (*Id.* at 116–18.) Plaintiff then asked for a transfer to a school in South Yonkers where the head custodian was a black man so he would not have to work "around Tommy Tarricone and what I called bigots." (*Id.* at 117.) Henderson said that he would see what he could do for plaintiff. (*Id.*) Subsequently, Henderson sent a memorandum dated June 2, 2000 to appropriate district personnel directing that plaintiff's regular pay should be continued from May 19, 2000. (Kelly Decl., Ex. 19.)

Later in June 2000, plaintiff went to pick up his paycheck and spoke with Franks, who asked him as he was leaving whether Yonkers should be concerned about DiBattista. (Jones Dep. at 219.) He replied by telling Franks:

When I go home tonight I'm either going to listen to some Miles Davis or some Joni Mitchell.... You people don't know me but you can tell that bigot that I said if he disrespects me ever again that way he did and in Tommy's office, I will get me a lawyer and I will sue him. And I will get Dr. Gourier, I will subpoena every teacher and anyone else I could. I do not want to be around these bigots. Now, you enjoy your day.

(*Id.*) Nothing else was said at that point by Franks. (*Id.* at 220.) Thereafter, on June 28, 2000, plaintiff received from Yonkers a letter initially drafted by Franks, but signed by the director of instructional staffing informing him that his employment was terminated effective July 6, 2000 for "poor job performance." (Complt. ¶ 45; Answer ¶ 27; Kelly Decl., Exs. 20, 22.) Plaintiff thereupon stopped working, but continued to receive full paychecks until his termination became effective on July 6, 2000. (Complt. ¶ 46; Answer ¶ 27.) He was replaced by a non-African-American custodial worker whom Yonkers transferred to Foxfire from another school. (Tarricone Dep. at 123–24.)

## DISCUSSION

### I. *Standard of Review*

Under Fed. R. Civ. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and

draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Services, L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994).

Moreover, "it is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases" because " 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation.' " *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.) (omission in original) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985)), *cert. denied,* 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001). Nevertheless, this Court should exercise "an extra measure of caution" before granting "summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001) (discussing standard for reviewing district court's grant of summary judgment); *see also Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003) ("[I]n discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.' ").

## II. *Racial Discrimination Claims*

Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). Similarly, the NYHRL provides in relevant part that "[i]t shall be an unlawful discriminatory practice ... [f]or an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. EXEC. LAW § 296(1)(a). It is well established that plaintiff's employment discrimination claims under Title VII and the NYHRL as well as §§ 1981 and 1983 are analyzed under the three-step burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 n. 5 (2d Cir.1996); *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 511 n. 15 (S.D.N.Y.2003) (Conner, J.).

Under the *McDonnell Douglas* analysis, the plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, a presumption that the employer unlawfully discriminated against the plaintiff is raised and the burden of production then shifts to the employer to "articulate a legitimate, clear, specific and non-discriminatory reason" for its actions. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). If the

employer does so, the presumption of discrimination drops out and the plaintiff has the burden to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff must submit evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination. *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 561 (2d Cir.1997), *cert. denied,* 525 U.S. 936, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998). In other words, defendant's proffered reason "cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742. The "ultimate burden" of proving intentional discrimination by a preponderance of the evidence remains with plaintiff at all times throughout this process. *Reeves v. Sanderson Plumb-* *ing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ By not arguing otherwise, defendants appear to concede that plaintiff has satisfied the *de minimis* requirement of establishing a prima facie case of discrimination under the *McDonnell Douglas* framework.[8] Plaintiff's memorandum skips to the third *McDonnell Douglas* step; he therefore also appears to concede that defendants have met their burden of production by citing deficiencies in plaintiff's conduct on the job as their legitimate non-discriminatory reason for his termination.[9] (Defs. Mem. Supp. Summ. J. at 6; Pl. Mem. Opp. Summ. J. at 19.) *See, e.g., Meiri,* 759 F.2d at 997 ("Meiri's profound inability to get along with her co-workers ... represents a legitimate non-discriminatory reason for an employment decision."). Accordingly, we now turn to whether plaintiff has submitted evidence sufficient to survive a motion for summary judgment that defendants' proffered reason is a pretext for racial discrimination.[10]

8. To satisfy the *de minimis* burden of establishing a prima facie case of discrimination, a plaintiff must establish that: (1) he is a member of a protected class; (2) he was performing his duties satisfactorily; (3) he was discharged; and (4) the discharge took place under circumstances that give rise to an inference of unlawful discrimination. *See, e.g., Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

9. Legitimate non-discriminatory reasons are "reasons that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Abdu–Brisson,* 239 F.3d at 468 (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 509, 113 S.Ct. 2742).

10. We note that defendants first argue that "the discriminatory power of the employer is practically unlimited" with respect to probationary civil service employees under N.Y. Educ. Law § 2573(4). (Defs. Mem. Supp. Summ. J. at 4–5.) As plaintiff points out and the cases cited by defendants themselves dem-

onstrate, this proposition is fundamentally incorrect. "It is well settled that a probationary employee may be discharged without a hearing and without a statement of reasons in the absence of any demonstration that dismissal was for a constitutionally impermissible purpose or in violation of statutory or decisional law." *York v. McGuire,* 63 N.Y.2d 760, 761, 469 N.E.2d 838, 480 N.Y.S.2d 320 (1984); *see also Rameau v. N.Y. State Dep't of Health,* 741 F.Supp. 68, 71 (S.D.N.Y.1990) (stating that "even a probationary employee may not be dismissed for racial or ethnic reasons"); *Gulemi v. Bradley,* 267 A.D.2d 386, 387, 700 N.Y.S.2d 215 (2d Dep't 1999) (affirming conclusion in Article 78 proceeding that a terminated probationary employee "failed to sustain her burden of establishing that her dismissal was based on a perceived disability in violation of the anti-discrimination laws or was otherwise motivated by bad faith"). Accordingly, we reject any contention that plaintiff's probationary status gives defendants *carte blanche* to discriminate against him on the basis of his race.

To demonstrate that an employer's legitimate non-discriminatory reason is a pretext for discrimination, "the plaintiff may rely 'on the evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir.) (quoting *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1333 (2d Cir.1997) (en banc), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)), *cert. denied*, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097. Independent evidence of discriminatory intent beyond that falsity may not be necessary. *Id.* ("Proof that defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may be quite persuasive."). In considering whether to grant summary judgment to defendants, we consider "a number of factors ... includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148–49, 120 S.Ct. 2097.

■ Plaintiff argues that the reprimands he received in March 2000 for having his brother in the school building, and in May 2000 for violating the "chain of command" and losing his temper with Tarricone were issued as pretexts for discrimination. Plaintiff cites evidence that tends to show that white employees Synan and Hillman were not disciplined when they had visitors in the building during working hours, and that white workers received free food in the cafeteria while black employees did not. (Pl. Mem. Opp. Summ. J. at 20–22.) Plaintiff argues that the "poor job performance" reason given on his termination letter is also pretextual because Tarricone admitted at his deposition that plaintiff's work was "fair." (*Id.* at 22.) Finally, plaintiff questions how he could be terminated in July 2000 for poor performance when he had not worked since May 16, 2000. (*Id.*) Defendants argue in response that the same-actor inference militates against any finding of discrimination because DiBattista was responsible for both plaintiff's hiring and termination. (Defs. Mem. Sup. Summ. J. at 7–8.) Defendants also argue that the large number of write-ups in May 2000 simply reflected plaintiff's worsening behavior, and that the record shows that his termination was the product of his poor conduct, not his race. (Defs. Reply Mem. Supp. Summ. J. at 3–4.)

We conclude that plaintiff has not introduced sufficient evidence of racial discrimination to create a question of material fact for the jury and defeat summary judgment. Plaintiff has not contradicted the veracity of many of defendants' complaints about his conduct on the job, particularly his sweeping of the cafeteria tables with a floor push broom, his threat to Fields and his numerous altercations with Weaver. Regardless of his argument that his job performance was admittedly "fair" in quality, plaintiff did not work under solitary conditions. Getting along with one's coworkers is an essential component of satisfactory job performance, especially in a setting like an elementary school. *Meiri*, 759 F.2d at 997; *see also Ramos v. Marriott, Int'l, Inc.*, 134 F.Supp.2d 328, 343 (S.D.N.Y.2001) (Conner, J.) (stating that the "failure of an employee to get along with coworkers rebuts the employee's pri-

ma facie case even if the employee's performance ratings were high in other respects.").

Moreover, plaintiff's allegations of disparate treatment with respect to employees having visitors during work hours ring hollow because plaintiff, as a probationary employee, was not situated similarly to Hillman and Synan, who were non-probationary.[11] A plaintiff may show discrimination by demonstrating that his employer treated him less favorably than similarly situated employees not members of his protected class. *See Ramos,* 134 F.Supp.2d at 339. Such employees must be "similarly situated in all material aspects," which means that there is " 'an objectively identifiable basis for comparability . . . a reasonably close resemblance of the facts and circumstances'; the situations of the individuals do not have to be identical." *Id.* at 339–40 (quoting *Graham,* 230 F.3d at 40). To be similarly situated, the employees must be subject to "the same workplace standards and that plaintiff's conduct was of seriousness comparable to that of conduct which went undisciplined." *Ramos,* 134 F.Supp.2d at 339–40. The employees' responsibilities and seniority are also considered in determining whether they are similarly situated. *Batista v. Union of Needleworkers,* No. 97 Civ. 4247, 2000 WL 1760923, at *3 (S.D.N.Y. Nov. 30, 2000) (granting employer's motion for summary judgment in race discrimination case when "the Organizing Directors to whom plaintiff compares himself are in fact far differently situated in terms of seniority and/or responsibility"). Whether two employees are similarly situated is ordinarily a question of fact. *See,*

*e.g., Mandell,* 316 F.3d at 379. However, a probationary civil service employee generally is not situated similarly to a non-probationary employee as a matter of law. *See* N.Y. EDUC. LAW § 2573(4) (stating that probationary janitors and custodians may be terminated summarily by the board of education at any time, but that "[s]uch persons who have served the full probationary period shall hold their respective positions during good behavior and efficient and competent service, and shall not be removed except for cause after a hearing by the affirmative vote of a majority of the board."); *see also Steinhauer v. DeGolier,* 359 F.3d 481, 484–85 (7th Cir.2004) (affirming district court's conclusion that a male Title VII plaintiff who was a probationary state employee was not situated similarly to a female non-probationary state employee who was not fired for the same infraction); *Mercer v. City of Cedar Rapids,* 308 F.3d 840, 845 (8th Cir.2002) (concluding that district court properly dismissed gender discrimination case because the plaintiff, a female police officer, "was a probationary employee whereas [the male captain with whom she had a prohibited romantic relationship] had the Civil Service rights of a permanent employee"). This status distinction notwithstanding, the Second Circuit recently held that a court is not precluded from inferring a discriminatory motive if an employer severely disciplines a probationary employee for an offense for which a non-probationary employee is not disciplined *"at all,"* especially with the presence of other facts and circumstances indicating discrimination. *See Feingold v. State of New York,* 366 F.3d 138, 153–54 (2d Cir.

**11.** With respect to plaintiff's contention that white workers received free food in the cafeteria while he did not (Pl. Mem. Opp. Summ. J. at 20), we do not consider this evidence of racial discrimination. There is no evidence that his supervisors Tarricone and DiBattista instructed Weaver not to give plaintiff free food. There is similarly no evidence in the record demonstrating that giving free food to employees is a practice sanctioned in any way by Yonkers, and that plaintiff was accordingly denied an *employment* benefit.

2004) (holding that a gay, white Jewish probationary administrative law judge ("ALJ") who was fired for adjudicating cases improperly demonstrated facts and circumstances permitting an inference of discrimination when non-probationary African–American ALJs were not disciplined at all for the same errors and anti-Semitic remarks had been made in the workplace).

We conclude that the disparity in treatment with respect to the March write-up, while arguably unfair, is not sufficient evidence of pretext to defeat defendants' motion for summary judgment. Aside from the fact that plaintiff was not situated similarly to Hillman and Synan, we conclude that the disparity between a write-up and no disciplinary action does not rise to the level recently contemplated by the Second Circuit in *Feingold*. Moreover, unlike the present case, wherein the insults directed at plaintiff were undoubtedly offensive, but not of a racial or ethnic character, *Feingold* contained a variety of external indicia of discrimination, including a litany of blatantly anti-Semitic and anti-gay remarks. *Id.* at 144–45. Finally, the present case is tailor-made for defendants' invocation of the same-actor permissive inference, which provides that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring." *Grady*, 130 F.3d at 560. Indeed, "[t]his inference remains significant where the time period between the hiring and the firing is less than two years." *Ramos*, 134 F.Supp.2d at 345. Moreover, despite plaintiff's contention to the contrary (Pl. Mem. Opp. Summ. J. at 24–25), the inference may be applied even when the supervisor at issue, here DiBattista, is not the only person with input into the hiring and firing decision. The inference "is applicable so long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff." *Ramos*, 134 F.Supp.2d at 345. Here, DiBattista was one of two interviewers who recommended plaintiff's hiring, served as one of his supervisors and ultimately was involved in the process by which he was discharged.

In sum, we conclude that even viewed in the light most favorable to plaintiff, this matter presents nothing more than a case of personal animosity among people who happen to be of different races, which is not a violation of the various civil rights statutes. *See Graziano v. N.Y. State Police*, 198 F.Supp.2d 570, 578 (S.D.N.Y.2002) (Conner, J.) (noting that the plaintiff "may (or may not) have been the unfortunate target of a conspiracy of his fellow employees who didn't like him" and "however malicious or contemptible such conduct might be, if it was not gender-motivated, it would not give rise to an action against their employer under Title VII . . . ."); *Richardson v. Newburgh Enlarged City Sch. Dist.*, 984 F.Supp. 735, 744 (S.D.N.Y.1997) (Conner, J.) ("Just because (1) some teachers had complaints about Richardson, and (2) Richardson is African–American, does not impel the conclusion that those teachers had misgivings about Richardson because she is African–American."). Moreover, even assuming that defendants exhibited a high degree of administrative incompetence and unfairness in the present case, the result remains the same because there is no evidence of racial discrimination by defendants. *See, e.g., Payano v. Fordham Tremont CMHC*, 287 F.Supp.2d 470, 475 (S.D.N.Y.2003) (stating that "where an employee seeks vindication of alleged employment-related unfair treatment that obviously has nothing to do with unlawful discrimination, it is patently improper and

ultimately fruitless for the complainant to attempt to shoehorn those grievances into a federal civil rights lawsuit under Title VII"); *see also Dale v. Chicago Trib. Co.,* 797 F.2d 458, 464 (7th Cir.1986) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions."), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). Indeed, the record before us indicates that the only racially-oriented comments were made by plaintiff himself. In short, the record demonstrates amply that defendants and other workers at Foxfire did not like plaintiff or his work, and clearly did not want to work with him. No admissible evidence in the record, however, demonstrates that their conduct was motivated by plaintiff's race. Accordingly, we grant defendants' motion for summary judgment dismissing all federal and state claims of racial discrimination.

### III. *Plaintiff's Retaliation Claims*

▪ Defendants next argue that this Court should grant their motion for summary judgment dismissing plaintiff's claims that he was discharged in retaliation for having engaged in activities protected by Title VII and the NYHRL.[12] Specifically, defendants contend that plaintiff has failed to establish a prima facie case of retaliation because his protected activities, namely his June 2000 complaint to Franks about Tarricone's behavior and his accompanying threat to sue, occurred after he had already been fired. (Defs. Retaliation Mem. Supp. Summ. J. at 3–5.) Plaintiff argues in response that he had been restored to the payroll following the investigation into his initial termination in May 2000 and was awaiting reassignment to work at the time he engaged in the protected activity that ultimately led to his termination by letter dated June 28, 2000. (Pl. Retaliation Mem. Opp. Summ. J. at 3–5.) We conclude that there is a genuine issue of material fact precluding dismissal of plaintiff's retaliation claims.

The anti-retaliation provision of Title VII provides in relevant part that an employer violates the statute if it "discriminate[s] against any of [its] employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Retaliatory acts are similarly unlawful under the NYHRL. *See* N.Y. EXEC. LAW § 296(1)(e). A court considering retaliation claims brought pursuant to Title VII and the NYHRL utilizes the same analytical framework for both the federal and state claims. *See, e.g., Knight v. City of New York,* 303 F.Supp.2d 485, 495 (S.D.N.Y.2004).

"Retaliatory discharge in violation of Title VII occurs when 'a retaliatory motive plays a part in [the discharge], ... whether or not it was the sole cause ... [or] when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist.' " *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177–78 (2d Cir.1996) (alterations and omissions in original) (quoting *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993)). Retaliatory discharge claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See, e.g., Reed,* 95 F.3d at 1178. Under this framework, "the plaintiff must make out a prima facie case of retaliation.... Second, the defendant then has the burden of artic-

---

**12.** The initial memoranda supplied by the parties did not address separately plaintiff's retaliation claims. Accordingly, on May 24, 2004, this Court requested from the parties supplemental briefing on the retaliation claims.

ulating a legitimate, non-retaliatory reason for the complained of action.... Third, if the defendant meets its burden, plaintiff must adduce evidence sufficient to raise a fact issue as to whether [the employer]'s reason was merely a pretext for retaliation." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768–69 (2d Cir.1998) (alterations in original; citations and internal quotation marks omitted).

It is well established in the Second Circuit that to establish a prima facie case of retaliation:

> [A] plaintiff must show "(1) that [he] was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that [he] suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action."

*Holtz*, 258 F.3d at 79 (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998)). The parties do not dispute that plaintiff has satisfied the first three elements of the prima facie case.[13] Accordingly, we need consider only the fourth element of the prima facie case.

Close temporal proximity between the plaintiff's protected conduct and adverse employment action satisfies the causal connection element of the prima facie retaliation case. *See, e.g., Feingold*, 366 F.3d at 156–57; *Quinn*, 159 F.3d at 769. Adverse employment action taken approximately one month after the plaintiff engaged in protected conduct is sufficiently close in time to satisfy this causal nexus requirement. *See Quinn*, 159 F.3d at 769 (holding that the plaintiff had established a sufficient causal nexus to survive summary judgment when she was terminated two months after first complaining to management and ten days after filing an administrative complaint with the state); *Tekula v. Bayport–Blue Point Sch. Dist.*, 295 F.Supp.2d 224, 231 (E.D.N.Y.2003) (holding that plaintiff alleged a sufficient causal connection when under one month passed between his protected protest and his termination); *Ashok v. Barnhart*, 289 F.Supp.2d 305, 315 (E.D.N.Y.2003) ("A period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related."); *Bandhan v. Lab. Corp. of Am.*, 234 F.Supp.2d 313, 319–20 (S.D.N.Y.2002) (concluding that the temporal proximity between the plaintiff's March 1999 discrim-

---

**13.** Termination is quite obviously an adverse employment action. *See, e.g., Feingold*, 366 F.3d at 156. Plaintiff's informal complaints to Franks, including his threat to sue Tarricone and subpoena the principal and teachers, are considered activities protected by Title VII. *See Knight*, 303 F.Supp.2d at 496 ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination.... Informal as well as formal complaints constitute protected activity." (citations omitted)); *cf. Sprott v. Franco*, No. 94 Civ. 79813, 1997 WL 79813, at *13 (S.D.N.Y. Feb. 25, 1997) (noting that "[p]laintiff also engaged in protected activity when she retained an attorney and had her attorney notify defendants that she intended to file a

lawsuit in federal court if they did not agree to settle her existing retaliation claim"); *Doe v. Kohn, Nast & Graf, P.C.*, 862 F.Supp. 1310, 1316–17 (E.D.Pa.1994) (holding in an ADA retaliation case that the plaintiff had engaged in protected activity when he threatened to sue his employer and his employer was aware that the plaintiff had sent relevant documents to his attorney, although he had not yet filed a charge with the EEOC). Moreover, the conduct complained of by plaintiff need not actually be discrimination, so long as plaintiff has a "good faith, reasonable belief" that the conduct he complains of is a violation of the anti-discrimination laws. *See, e.g., Knight*, 303 F.Supp.2d at 496.

ination complaint letter to the defendant's senior management and her termination in May 1999 was a sufficient causal nexus to survive summary judgment). A plaintiff may not, however, satisfy the causal connection element if the protected conduct occurred after the adverse employment action. *See, e.g., Arias v. Nasdaq/Amex. Mkt. Group,* No. 00 Civ. 9827, 2003 WL 354978, at *12 (S.D.N.Y. Feb. 18, 2003).

Here, the parties appear to dispute when plaintiff actually was terminated. Defendants argue that the requisite temporal proximity does not exist because the decision to terminate plaintiff was made in May 2000, more than a month before the occurrence of the conduct upon which his retaliation claim is based. (Defs. Retaliation Mem. Supp. Summ. J. at 2–3.) Plaintiff contends that he was terminated initially in May and then reinstated following his meetings with Henderson and Williams; he considers the June termination to be a separate event triggered by his statement made that month to Franks.

(Pl. Retaliation Mem. Opp. Summ. J. at 5.) Viewing these facts, as we must, in the light most favorable to plaintiff, we conclude that plaintiff has established a prima facie case sufficient to survive defendants' motion for summary judgment.[14] *Cf. Feingold,* 366 F.3d at 156–57 (holding that a fact question existed as to whether an ALJ was terminated because of complaints he made about discrimination, or because of an intervening event involving an improper adjudication accompanied by an outburst that would provide a legitimate reason). Accepting defendants' complaints about his job performance and interpersonal relations as their proffered legitimate non-discriminatory reason for discharging plaintiff,[15] *see supra* Part II., we conclude that plaintiff has established a genuine issue of material fact about whether retaliation was a factor in defendants' decision to terminate his employment, *Reed,* 95 F.3d at 1177–78, and we therefore deny defendants' motion for summary judgment dismissing the retaliation claims.

**14.** Defendants, relying on *Ricks v. Conde Nast Publications, Inc.,* 92 F.Supp.2d 338, 347–48 (S.D.N.Y.2000), *aff'd,* 6 Fed.Appx. 74, 2001 WL 273835 (2d Cir.2001) (unpublished opinion), argue that there was no retaliation because they had initiated efforts to terminate plaintiff's employment before he engaged in protected conduct. (Defs. Retaliation Mem. Supp. Summ. J. at 3–4.) In *Ricks,* a race discrimination case, the plaintiff's employment was terminated on October 14, 1997. 92 F.Supp.2d at 342. Her attorney had sent the employer a letter on September 12, 1997 complaining that the plaintiff's civil rights had been violated at work, and filed an EEOC charge on September 26, 1997. *Id.* at 347. The court granted the employer's motion for summary judgment dismissing her claims of Title VII retaliation. *Id.* at 349. The court concluded that the plaintiff failed to establish a causal connection because the employer had already taken "clear steps" towards her termination in advance of the protected conduct. *Id.* at 347. The court noted that the plaintiff received an oral warning in August 1997 that she would be terminated if her performance did not improve, followed by a written warning to that same effect in September 1997. *Id.* at 347–48. We agree with plaintiff's argument that *Ricks* is distinguishable because in that case, the plaintiff was terminated only once following a series of escalating warnings. (Pl. Retaliation Mem. Opp. Summ. J. at 6.) In contrast, in the present case, defendants appeared to terminate plaintiff's employment on two separate occasions, and the termination that arguably was triggered by the protected conduct occurred after he had been reinstated on the payroll.

**15.** We disagree with plaintiff's contention that defendants have failed to proffer a legitimate non-discriminatory reason for the June termination because it is logically impossible to terminate a person for poor job performance who has not worked for that employer in two months. (Pl. Retaliation Mem. Opp. Summ. J. at 6–7.) This could indicate that defendants' perception of plaintiff's previous job performance and interpersonal relations remained unchanged.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. We grant defendants' motion for summary judgment dismissing plaintiff's racial discrimination claims. We deny defendants' motion for summary judgment dismissing plaintiff's retaliation claims.

SO ORDERED.